**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Oranna Bumgarner FELTER, Defendant-Appellee.**

No. 82–1745.

United States Court of Appeals, Tenth Circuit.

Jan. 17, 1985.

**1506**

Martin Green, U.S. Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Raymond N. Zagone and Robert L. Klarquist, U.S. Dept. of Justice, Washington, D.C., Brent D. Ward, U.S. Atty., Bruce Lubeck, Asst. U.S. Atty., Salt Lake City, Utah, were also on the briefs), for plaintiff-appellant.

Kathryn Collard of Collard, Pixton, Iwasaki & Downes, Salt Lake City, Utah, for defendant-appellee.

Martin E. Seneca, Jr., Washington, D.C., argued and submitted briefs for amicus curiae, the Ute Indian Tribe.

Mary Ellen Sloan, Salt Lake City, Utah, submitted a brief for amicus curiae, the Paiute Indian Tribe.

Before HOLLOWAY, Chief Judge, McWILLIAMS, Circuit Judge, and KERR, District Judge *.

---

\* The Honorable Ewing T. Kerr, United States District Judge for the District of Wyoming, sitting by designation.

1.  Section 677 states that
    [t]he purpose of this [Act] is to provide for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof; for the termination of Federal supervision of the trust,

HOLLOWAY, Chief Judge.

The Government appeals the district court's ruling that defendant, a mixed-blood Ute Indian, did not unlawfully fish within the Uintah and Ouray Indian Reservation in violation of 18 U.S.C. § 1165. The Act of August 27, 1954, ch. 1009, 68 Stat. 868, codified at 25 U.S.C. §§ 677–677aa ("1954 Act"), divided the Ute Tribe into two groups: mixed-blood members and full-blood members. The district court held that persons identified as mixed-blood members under the 1954 Act for purposes of distributing tribal assets, and for purposes of terminating federal supervision over the property of mixed-blood members, retained the right to fish and hunt within the reservation. We are persuaded by the reasoning of the district court's scholarly opinion, 546 F.Supp. 1002, and we affirm.

## I

### A. *The 1954 Act*

During the 1950s, Congress developed a new approach in federal Indian policy. Congress passed legislation to end the special relationship between certain Indian tribes and the federal government. This legislation terminated federal supervision and services in relation to these tribes. *See generally* F. Cohen, *Handbook of Federal Indian Law* 152–80 (1982). The 1954 Act [1] terminated the federal mixed-blood Ute Indians of the Uintah and Ouray Reservation in Utah. *See Ute Indian Tribe of the Uintah and Ouray Reservation v. Probst*, 428 F.2d 491, 495–96 (10th Cir.) ("The [1954] Act was intended to distribute tribal property and terminate federal supervision over the mixed-bloods."),[2] *cert.*

and restricted property, of the mixed-blood members of said tribe; and for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property.
25 U.S.C. § 677.

2.  The House report accompanying the Act indicated that "[a]ccording to testimony from members of the Ute Tribe, the majority of the mixed-blood group feel that they are ready for a termi-

*denied,* 400 U.S. 926, 927, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970).

Under this Act, Congress divided the Ute Tribe into two groups: full-blood members (those with one-half degree of Ute Indian blood and a total Indian blood in excess of one-half) and mixed-blood members (those with insufficient Indian or Ute blood to qualify as full-blood Utes, or those full-blood Utes who elect to be treated as mixed-blood members). 25 U.S.C. § 677a(b), (c). The Act required the preparation and publication of rolls listing the full-blood and mixed-blood members of the Tribe. *Id.* § 677g. These rolls were published in the Federal Register on April 5, 1956. 21 Fed.Reg. 2208–12. Defendant was listed on the roll of mixed-bloods. *Id.* 22——. The Act provided that upon publication of the rolls, "the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter." 25 U.S.C. § 677d.

The Act required the division between the full-blood and the mixed-blood Utes of tribal assets "susceptible to equitable and practical distribution." *Id.* § 677i. Mixed-blood members received "unrestricted control" of their proportionate share of the divided property. Federal supervision of mixed-blood members and their property was terminated, "except as to [their] remaining interest in ... tribal assets not

susceptible to equitable and practicable distribution." *Id.* § 677o (a). The Act extinguished the Federal trust relationship with mixed-blood members;[3] these members were no longer "entitled to any of the services performed for Indians because of his status as an Indian."[4] *Id.* § 677v.

### B. *The Facts*

The material facts of the case are reported in the district court's opinion, *United States v. Felter,* 546 F.Supp. 1002, 1003–04 (D.Utah 1982), and are not in dispute.

On June 6, 1980, defendant was issued a Federal misdemeanor citation for violation of 18 U.S.C. § 1165,[5] by fishing without a tribal permit at the Bottle Hollow Reservoir within Indian Country and upon lands in the Uintah and Ouray Indian Reservation held in trust by the United States for the Ute Indian Tribe. I R. 1. At trial before a magistrate, defendant did not deny fishing at that time and place. Instead, she contended that she had a legal right to fish on the reservation which would negate any liability under § 1165. Defendant maintained that as a mixed-blood Ute Indian, her right to fish the waters located on the reservation was not abrogated by the 1954 Act.

The magistrate held that the 1954 Act terminated the right of the mixed-blood Utes to hunt and fish on the reservation. The magistrate relied primarily on *Menom-*

---

nation of Federal supervision over their property and fullblood Indians believe that they are not ready for such action." H.R.Rep. No. 2493, 83rd cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3355, 3356.

**3.** The Act provided that the Federal trust relationship with mixed-blood members would be extinguished upon publication of a proclamation in the Federal Register. This proclamation was published in the Federal Register on August 24, 1961. 26 Fed.Reg. 8042.

**4.** This section also provided that:
All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within that jurisdiction. 25 U.S.C. § 677v.

**5.** Section 1165 provides that:
Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more that [sic] $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited. 18 U.S.C. § 1165.

*inee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). I R. 219–22. The Supreme Court there held that the Menominee Indian Termination Act of 1954 ("Menominee Termination Act"), ch. 303, 68 Stat. 250, did not abrogate the hunting and fishing rights of the Menominee Indians in Wisconsin. Although the Menominee Termination Act did not mention hunting and fishing rights, the Court held that the Act had to be read *in pari materia* with Public Law 280, Act of August 15, 1953, ch. 505, 67 Stat. 588,[6] which stated that "[n]othing in this section ... shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." *Id.* The Court concluded that because Wisconsin was one of the states to which Public Law 280 ceded jurisdiction over offenses committed by Indians within the state, Public Law 280 and the Menominee Termination Act, read together, compelled the finding that Menominee Indians retained the right to fish and hunt. The Court held that this conclusion was consistent with § 10 of the Menominee Termination Act, which stated that "all *statutes* of the United States which affect Indians because of their status as Indians shall no longer be applicable to members of the tribe"; the Court emphasized that the Menominee tribe's hunting and fishing rights were a creature of an 1854 treaty.

The magistrate held that the Court's decision in *Menominee Tribe* required the conclusion that the 1954 Act abrogated the right of mixed-blood Utes to fish and hunt for two reasons. First, Public Law 280 did not apply to the State of Utah.[7] Second, the Utes' right to hunt and fish was based on an 1864 Act of Congress, not on a treaty. Act of May 5, 1864, Ch. 77, 13 Stat.

63. *See* 546 F.Supp. at 1010 & n. 22; I R. 7–9.

The district court reversed. The court agreed that *Menominee Tribe* was relevant, but disagreed with the two reasons cited by the magistrate to distinguish that case. First, the district court stated that Utah's decision not to voluntarily assume jurisdiction over its Indians under Public Law 280 should not affect the analysis in *Menominee Tribe* on reading Public Law 280 in *pari materia* with contemporaneous Indian termination acts like the 1954 Act. 546 F.Supp. at 1016–18. Second, the district court noted that the statutory basis of the hunting and fishing rights did not distinguish the case from *Menominee Tribe* where these rights were based on a treaty. *Id.* at 1011–14. The district court then stated that, "[l]ike the Supreme Court in *Menominee* [*Tribe* ], this Court will readily 'decline to construe the [1954] Act as a backhanded way of abrogating the hunting and fishing rights of these Indians.'" *Id.* at 1014 (quoting *Menominee Tribe*, 391 U.S. at 412, 88 S.Ct. at 1711).

The district court "refuse[d] to find a complete abrogation of the mixed-blood Utes' hunting and fishing rights for the simple reason that Congress did not provide for one." 546 F.Supp. at 1018. The district court held that the provision in § 677d that "[m]ixed-blood members shall have no interest therein except as otherwise provided in this subchapter" did not abrogate the hunting and fishing rights because these rights constituted "assets not susceptible to equitable and practicable distribution" under § 677i in which the mixed-blood Utes retained an interest in common with the tribal membership. 546 F.Supp. at 1023. The Government appeals.

## II

The narrow question involved in this appeal is whether defendant can be held crim-

---

6. Public Law 280, as subsequently amended, is codified at 18 U.S.C. § 1162, 28 U.S.C. § 1360, and 25 U.S.C. §§ 1321–1326.

7. Under current law, Indian tribes must consent to any state assumption of jurisdiction over "Indian country." *See* 25 U.S.C. §§ 1321(a),

1322(a). Although Utah since has indicated its willingness to assume this jurisdiction, no Indian tribe has accepted its offer. *See* Utah Code Ann §§ 63–36–9 to 63–36–21; *see also* 546 F.Supp. at 1016 n. 32.

inally liable under § 1165 for unlawfully hunting and fishing on the reservation. The Government argues that defendant is subject to liability under § 1165 because the 1954 Act abrogated the right of mixed-blood Ute Indians to hunt and fish on the reservation. The Government contends that § 677d "is the nub around which this case pivots." Reply Brief for the United States 1. According to the Government, by providing that the Tribe shall "consist exclusively of full-blood members" and that "[m]ixed blood members shall have no interest therein except as otherwise provided in this Act," § 677d "unambiguously" states that mixed-blood Ute Indians no longer possess the right to hunt and fish on the reservation. Brief for the Appellant 6. Defendant responds that the mixed-blood members retained the right to. hunt and fish because the 1954 Act "otherwise provided" in § 677i that mixed-blood members retained interest in "tribal assets not susceptible to equitable and practicable distribution." Brief of the Appellee 3–6.

At the outset, we note that the 1954 Act does not contain provisions specifically treating the right to hunt and fish. We believe that proper construction of the 1954 Act compels the conclusion that the mixed-blood Ute Indians retained the right to hunt and fish on reservation land.

The Court's reasoning in *Menominee Tribe* is instructive. The Court there held that the Menominee Termination Act did not abrogate the rights of the Menominee Indians to hunt and fish on the reservation free from state regulation. The Court emphasized that because the Termination Act contained no "explicit statement" abrogating the hunting and fishing rights, the Court "decline[d] to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians." 391 U.S. at 412–13, 88 S.Ct. at 1710–11.

The Government attempts to distinguish *Menominee Tribe* by noting that the Court protected the Tribe's hunting and fishing rights, while this case involves the rights of mixed-blood Ute Indians who, by virtue

of § 677d, are no longer tribal members. Brief for the Appellant 20–21. The flaw in the Government's position, however, is revealed by its attempt to treat mixed-blood Ute Indians as "ordinary American citizens [who] do not possess the right to hunt and fish upon lands included in Indian reservations." *Id.* at 21.

■ The right to hunt and fish on reservation land is a long-established tribal right. *See generally* F. Cohen, *Handbook of Federal Indian Law* 441–456, 464–70 (1982 ed.); Reynolds, *Indian Hunting and Fishing Rights: The Role of Tribal Sovereignty and Preemption,* 62 N.C.L.Rev. 743 (1984). Individual Indians, however, enjoy a right of user in the tribe's hunting and fishing rights. *See Kimball v. Callahan,* 590 F.2d 768, 773 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (*"Kimball II"*); *Whitefoot v. United States,* 293 F.2d 658, 663 (Ct.Cl.1961), *cert. denied,* 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962); *Felter,* 546 F.Supp. at 1021–23; *Attorney General v. Hermes,* 127 Mich.App. 777, 339 N.W.2d 545, 549 (1983); F. Cohen, *supra,* at 605–09. The parties do not dispute that defendant, as a member of the Ute Indian Tribe, possessed the right to hunt and fish on the reservation before passage of the 1954 Act. *E.g.,* I R. 218–19. The Government's attempt to treat mixed-blood Ute Indians as "ordinary American citizens" therefore fails because, at least before 1954, these mixed-blood Ute Indians enjoyed the right to hunt and fish on the reservation, unlike "ordinary American citizens."

■ Other cases support our conclusion that *Menominee Tribe* directs us to not read the 1954 Act as a "backhanded way of abrogating the hunting and fishing rights" of mixed-blood Ute Indians in the absence of any "explicit statement" abrogating those rights. For example, the Ninth Circuit in *Kimball v. Callahan,* 493 F.2d 564 (9th Cir.), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (*"Kimball*

*I''*), relied on *Menominee Tribe* in concluding that members of the Klamath Indian Tribe who withdrew from tribal membership pursuant to the Klamath Termination Act retained the right to hunt, fish and trap on former reservation land free from state fish and game regulations.[8] The Ninth Circuit also has held that Klamath Indian Tribal members retained hunting, fishing and trapping rights free from state regulation on lands ceded to the United States in 1901 and ratified by Congress in 1906. *Klamath Indian Tribe v. Oregon Department of Fish and Wildlife,* 729 F.2d 609 (9th Cir.), *cert. granted,* —— U.S. ——, 105 S.Ct. 242, 83 L.Ed.2d 180 (1984). The Ninth Circuit there "[e]mphasize[d] that nowhere in the 1906 act are hunting, fishing and trapping rights mentioned," and concluded that "the state has not shown the clear congressional intent required" to abrogate the Tribe's rights to hunt, fish, and trap. *Id.* at 613.[9]

We have recognized that "the Supreme Court has been solicitous in its protection of the hunting and fishing rights of Indians." *Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma,* 618 F.2d 665, 669 (10th Cir.1980). We held there that the hunting and fishing rights of Indians on allotments and on tribal trust lands survive disestablishment of an Indian reservation, and, because the land remains in Indian Country status, they are not subject to state regulation.

*Menominee Tribe* and its progeny reflect the courts' reluctance to impute congressional intent to abrogate Indian rights to hunt and fish, absent explicit language to that effect. *See also* Cohen, *supra,* at 468–70. The Government contends that § 677d unambiguously abrogates the right of mixed-blood Ute Indians to hunt and fish on reservation land. Yet § 677d does not mention hunting and fishing rights; the section instead provides that the Tribe shall "consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this [Act]." The parties differ over whether § 677i "otherwise provide[s]" that mixed-blood members retain the right to hunt and fish on reservation land. Section 677i, in pertinent part, provides that:

> All unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution shall be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group, subject to such supervision by the Secretary as is otherwise required by law, and the net proceeds therefrom after deducting the costs chargeable to such management shall first be divided between the full-blood and mixed-blood groups in direct proportion to the number of persons comprising the final membership roll of each group and without regard to the number

---

**8.** The Government attempts to distinguish *Kimball I* from the present case on the ground that the plaintiffs in *Kimball I* "were not seeking to hunt or fish on lands which remained in tribal ownership," but were seeking to hunt and fish "'on the former Indian land that was sold to pay them for their shares in tribal property.'" Brief for the Appellant 16 (quoting 493 F.2d at 567). In addition, two other features of *Kimball I* are different from the instant case. First, the Klamath Termination Act provided that "[n]othing in this subchapter shall abrogate any fishing rights or privileges of the tribe or members thereof enjoyed under Federal treaty." 25 U.S.C. § 564m(b). The 1954 Act does not contain a similar provision. Second, Public Law 280 gave Oregon jurisdiction over offenses committed by Indians on Indian country within Oregon (except the Warm Springs Reservation).

18 U.S.C. § 1162(a). Public Law 280 did not similarly cede jurisdiction to Utah.

These distinctions do not detract from the *Kimball I* court's reliance on *Menominee Tribe* as pronouncing the "requirement that Congress clearly indicate when it intends to abrogate treaty rights." 493 F.2d at 569. This requirement is equally applicable to abrogation of Indian rights based in federal statutes. *See, e.g., Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *see generally* F. Cohen, *supra,* at 223–25.

**9.** Defendant argues in her supplemental memorandum dated April 9, 1984 that this case supports her position that the 1954 Act did not extinguish the right of the mixed-blood Ute Indians to hunt and fish on the reservation.

of persons comprising each group at the time of the division of such proceeds. 25 U.S.C. § 677i.

The Government contends that "neither the Magistrate nor the district court focused upon [§ 677d], and the consequences with respect to hunting and fishing rights it clearly has." Brief for the Appellant 11. The district court, however, quoted both § 677d and § 677i when it stated:

> Are hunting and fishing rights susceptible to "equitable and practicable distribution" between the mixed blood and the tribe? ....
>
> Aside from the right to hunt or fish on tribal lands to the exclusion of others, the tribe possesses the discretion inherent in the police power to regulate and allocate the fish and game resources as it sees fit, within the constraints imposed by law. Is that authority readily susceptible to "equitable and practicable distribution," i.e., to wholesale delegation? Probably not. Nothing in the Act, or in the organizational documents of the mixed-blood corporations reflects any such intent.

546 F.Supp. at 1023 (citations omitted). The Government urges on appeal that the district court's interpretation of the phrase "all other assets not susceptible to equitable and practicable distribution" in § 677i should not insulate defendant from liability under § 1165 for hunting and fishing on the reservation for two reasons.

First, the Government argues that the district court decided only that the tribe's *authority* to regulate and allocate fish and game on reservation land is "probably not" susceptible to "equitable and practicable distribution"; the Government contends that the district court did not determine whether the tribal right to hunt and fish on the reservation is a tribal *asset* susceptible to equitable and practicable distribution. The Government asserts that

since the statute is silent on this question, the only result which the court could have reached is that the tribe is *not* divested of any portion of the tribal hunting or fishing right: the well settled rule, in the construction of statutes relating to Indian Tribes, being that a legislative extinguishment of tribal rights is not to be lightly implied.

Reply Brief for the United States 4.

We believe the canon of statutory construction cited by the Government requires us to conclude that, because the 1954 Act is silent on the issue of whether the mixed-blood Ute Indians retained the right to hunt and fish on the reservation, we should not impute an intent on the part of Congress to abrogate this right of the mixed-blood Ute Indians. This "eminently sound and vital canon" of construction, *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797 n. 7, 48 L.Ed.2d 274 (1976), provides that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918); *see also Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Antoine v. Washington*, 420 U.S. 194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); *see generally F. Cohen, supra*, at 221–25.

The Government's crabbed reading of this canon of construction to exclude mixed-blood Ute Indians from its protections [10] is not supported in the case law or by the purposes of the canon. The leading treatise in this area explains that:

> The rules for construing federal statutes in Indian affairs have a pervasive influence in Indian law. The canons are vari-

---

**10.** In its Brief as amicus curiae, the Ute Indian Tribe of the Uintah and Ouray Reservation of Utah similarly argues, without any case support, that the canon of construction favorable to Indians applies only to the full-blood Ute Indians and not to the mixed-blood members. Brief of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah as Amicus Curiae 14. In its Brief as amicus curiae, the Paiute Indian Tribe of Utah contends that this canon of construction applies to mixed-blood members as well. Brief of the Paiute Indian Tribe of Utah as Amicus Curiae 3–4.

ously phrased in different contexts, but generally they provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited. These canons play an essential role in implementing the trust relationship between the United States and Indian tribes and are involved in most of the subject matter of Indian law.

F. Cohen, *supra*, at 224–25. We reject the Government's position that this canon is inapplicable to mixed-blood Ute Indians because they are like "ordinary American citizens." Unlike the "ordinary American citizen," these mixed-blood Ute Indians enjoyed the right to hunt and fish on the reservation before passage of the 1954 Act. Following the teaching of the Supreme Court in *Menominee Tribe*, we decline to construe the 1954 Act "as a backhanded way of abrogating the hunting and fishing rights of these Indians" in the absence of an "explicit statement" in the 1954 Act abrogating these rights. *Menominee Tribe*, 391 U.S. at 412–13, 88 S.Ct. at 1710–11. We believe the preferable course is to refuse to impute to Congress an intent to abrogate the right of the mixed-blood Ute Indians to hunt and fish on reservation land and instead hold that the right to hunt and fish on the reservation is an "asset[ ] not susceptible to equitable and practicable distribution" under § 677i.

Second, the Government argues that "even if we were to assume that hunting and fishing rights *are* tribal assets not susceptible to equitable and practicable distribution ... [defendant] still would not have the right to hunt or fish without authorization from the Tribe." Reply Brief of the United States 4. The Government reasons that

> "assets not susceptible to equitable and practicable distribution" are not subject to appropriation at the whim of individual full-blood or mixed-blood Utes, but are "managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group" .... [Defendant therefore does] not have the right herself to go on the land, whither she will, to hunt and fish.

*Id.* at 5–6.

We agree with the district court, which held that defendant's conviction could not stand under § 1165 because the Government failed to prove that defendant "was not in fact exercising the rights retained by her as explained in this opinion." 546 F.Supp. at 1027.[11] We agree that:

> To convict a mixed-blood Ute enrolled upon the final mixed-blood roll of hunting or fishing in violation of 18 U.S.C. § 1165, the Government must establish that the defendant was acting in violation of an applicable tribal regulation as to the time, method and manner of fishing or hunting by tribal members.
>
> Upon review of the record in this case, this court must find that as a matter of law the conviction cannot be sustained

---

**11.** The district court also explained that:

> Though entitled to the fishing rights of a member of the tribe, Oranna B. Felter is no longer so enrolled, nor is she federally recognized as "Indian." Her situation is, therefore, distinguishable from that of the defendant in *United States v. Jackson*, 600 F.2d 1283 (9th Cir.1979), in which the United States Court of Appeals for the Ninth Circuit held that 18 U.S.C. § 1165 was not applicable to tribal members who hunted in violation of tribal regulations. Tribal jurisdiction over such minor offenses remains exclusive. *Id.*, at 1286–1288; *United States v. Wheeler*, 435 U.S. 313, 323–326 & nn. 20–23, 98 S.Ct. 1079, 1086–1087 & nn. 20–23, 55 L.Ed.2d 303 (1978). Indian tribes lack jurisdiction to try and punish non-Indians for criminal offenses, see *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978) and 18 U.S.C. § 1165 was designed to fill that gap in enforcement powers as to non-Indians hunting or fishing on tribal or other Indian lands without tribal permission. *Id.*, 435 U.S. at 206, 98 S.Ct. at 1019; *United States v. Jackson, supra*, at 1286–1287. Because of the [1954] Act, Oranna B. Felter would fall into the "non-Indian" category.

546 F.Supp. at 1026.

due to the failure of the Government to overcome the defendant's claim of right. *Id.*[12]

### III

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

12. Defendant's Brief requests that we award her attorneys' fees incurred in this appeal. Brief of the Appellee 8–9. Defendant does not direct us to any authority which would permit us to award attorneys' fees against the Government on appeal in a criminal case apart from the provisions of the Criminal Justice Act. 18 U.S.C. § 3006A. In these circumstances, we must decline the request for attorneys' fees.