**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 9, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee/
Cross Appellant,

v.

UINTAH VALLEY SHOSHONE
TRIBE; DORA VAN; RAMONA
HARRIS; LEO LeBARON; and others
who are in active concert with the
foregoing,

      Defendants - Appellants/
Cross Appellees.

Nos. 18-4151 and 18-4160

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:17-CV-01140-BSJ)**

---

Michael J. Rock, Michael J Rock, PLLC, Detroit, Michigan, for Appellants/Cross-Appellees.

Jared C. Bennett, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the briefs), Office of the United States Attorney, Salt Lake City, Utah, for Appellee/Cross-Appellant.

---

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **CARSON**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

The United States sought to enjoin the Uintah Valley Shoshone Tribe and several individual members from selling hunting and fishing licenses that authorized members to take wildlife from the Uintah and Ouray Reservation. The Uintah Valley Shoshone Tribe is not a federally recognized Indian tribe, but it nonetheless claims to have tribal rights, including hunting and fishing rights, related to the Reservation.

The district court held the Uintah Valley Shoshone Tribe has no authority to issue licenses. The court, however, declined to issue a permanent injunction prohibiting the issuance of future licenses against both the individual defendants and the Tribe. We agree with the district court that the Uintah Valley Shoshone Tribe lacks authority to issue hunting and fishing licenses, and we find the district court did not abuse its discretion in declining to issue a permanent injunction.

## I. Background

The Uintah and Ouray Reservation is located in northeastern Utah and is the largest Indian reservation inhabited by members of the Ute Tribe. The Ute Indians were originally composed of many bands dwelling across the state, each with its own identity, and once occupied nearly half of the land comprising present-day Utah. Floyd A. O'Neil & Kathryn L. MacKay, *A History of the Uintah-Ouray Ute Lands*, 2 (1978). In 1861, President Lincoln established the Uintah Valley Reservation in the Territory of Utah, which became a permanent

reservation in 1864, and the tribal bands were to be consolidated within the reservation.

After the Uintah Valley Reservation was established, the United States attempted treaty negotiations with the various Indian bands living on the Reservation. Gustive O. Larson, *Uintah Dream: The Ute Treaty—Spanish Fork, 1865*, 14 BYU Stud. Q. 291, 363 (1974). The chiefs of the bands of Indians resisted the terms of the initial treaty draft in an effort to keep their land, but after a series of private negotiations, they relented. The Spanish Fork Treaty, which surrendered certain rights of Indians and reserved others, was sent to the Senate in 1866 where it waited for ratification. In 1869, the new Commissioner of Indian Affairs recommended the treaty not be ratified in hopes of making a better treaty. The Senate, therefore, adopted a resolution that it did not advise and consent to the treaty's ratification. But even without the ratification of the Spanish Fork Treaty, different bands of Indians settled on the Uintah Reservation and became known as the Uintah Indians. *See Uintah and White River Band of Ute Indians v. United States*, 152 F. Supp. 953, 954–55 (Ct. Cl. 1957).

A presidential Executive Order of January 5, 1882, established the Uncompahgre Reservation for Uncompahgre Utes. After the Indian Reorganization Act of 1934, the Uintah, White River, and Uncompahgre bands of

the Ute Tribe reorganized to form the Ute Tribe of the Uintah and Ouray Reservation.

In 1954, Congress passed legislation that significantly reorganized the Ute Tribe. In the Ute Partition and Termination Act of August 27, 1954, ch. 1009, 68 Stat. 868 (codified as amended at 25 U.S.C. §§ 677–677aa), Congress established how the members of the Tribe would be determined. The Act first distinguished between "full-blood" and "mixed-blood" Utes. "Full-blood" Utes are members who possess "one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half, excepting those who become mixed-bloods by choice under the provisions of section 4 hereof." *Id.* By contrast, "mixed-blood" Utes are members who do "not possess sufficient Indian or Ute Indian blood to fall within the full-blood class as herein defined, and those who become mixed-bloods by choice under the provisions of section 4 hereof." *Id.* In 1956, the Secretary published final rolls that listed 1,314 full-blood members and 490 mixed-blood members. Pursuant to the Termination Act, after publication of this list, "the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this Act." Thus, the Act terminated the membership of federal mixed-blood Ute Indians with limited rights surviving that determination.

After the Termination Act ended their tribal membership, some of the mixed-blood Utes created an organization they called the Uintah Valley Shoshone Tribe. But the organization is not, and never was, federally recognized as a tribe. Rather, it is composed of mixed-blood Utes whose membership was terminated under the Termination Act and their descendants. The leadership of the organization currently includes individual defendants named in the complaint—Dora Van, chairwoman; Ramona Harris, director; and Leo LeBaron, director for wildlife.

In 2016 and 2017, the Uintah Valley Shoshone Tribe sold hunting and fishing licenses to its members, authorizing the members to take wildlife from the Uintah and Ouray Reservation. The area within the Uintah and Ouray Reservation where the licenses were sold includes state, federal, tribal, and private land as well as Ute Tribal Trust Lands.

In offering the licenses, the hunting and fishing applications assert the Uintah Valley Shoshone Tribe is "a Federal Corporation d/b/a the 'Ute Indian Tribe' of the Uintah & Ouray Reservations, Utah." App. 720. And the hunting licenses state the Uintah Valley Shoshone Tribe is a "Federally Recognized Tribe." App. 721–23. In addition, the organization has placed its own "No Trespassing" signs on Ute reservation lands. App. 746.

To communicate to members about the hunting and fishing program, Van and Harris used the organization's Yahoo! email account and Facebook page. Several Facebook subscribers live outside the State of Utah, and they received numerous communications about the hunting and fishing program.

In 2016, the Ute Division of Fish and Game encountered several members of the Uintah Valley Shoshone Tribe hunting on the Ute reservation. The Ute Tribe issued citations to the members and they were warned about the illegitimacy of the hunting licenses. In addition, a Special Agent for the United States Fish and Wildlife Service told the Uintah Valley Shoshone Tribe leadership that the licenses were invalid. Nevertheless, the organization continued to sell licenses well into 2017.[1]

The United States filed a complaint and moved for a temporary restraining order against the Uintah Valley Shoshone Tribe under 18 U.S.C. § 1345, which allows courts to enjoin wire fraud. The United States argues the Uintah Valley Shoshone Tribe has engaged in a scheme to obtain money by falsely representing to members that the organization has the authority to issue licenses to hunt and fish on Ute land. Because the organization used Yahoo! and Facebook to

---

[1] The Uintah Valley Shoshone Tribe agreed not to sell any licenses while this litigation is pending.

communicate to members, the United States asserts the organization used interstate wire communications to further its scheme.

In response, the Uintah Valley Shoshone Tribe presents two main arguments. First, it argues the Ute Partition and Termination Act did not abrogate hunting and fishing rights for mixed-blood members. Therefore, its members are free to hunt and fish on the Uintah and Ouray Reservation. Second, the Uintah Valley Shoshone Tribe argues the organization has maintained a cultural identity and thus possesses certain treaty rights. The organization's roots trace back to 1861 when the United States created the Uintah Valley Reservation. Even though the United States has no formal relationship with the Uintah Valley Shoshone Tribe, the Tribe contends the organization retains the treaty rights established in 1861 to use the land because it has maintained its separate and distinct tribal community.

## II. Analysis

The Uintah Valley Shoshone Tribe contends it has authority to issue hunting and fishing licenses on the Reservation. If the answer to that question is no, the United States argues the district court abused its discretion in denying the permanent injunction. We address each argument in turn.

### A. The Uintah Valley Shoshone Tribe Lacked Authority to Issue Hunting and Fishing Licenses

The Uintah Valley Shoshone Tribe argues its rights were not ceded by the Ute Partition and Termination Act of 1954 and it can therefore exercise tribal rights, including issuing hunting and fishing licenses. The organization points to the Executive Order of 1861 as the basis for its rights. While we recognize the significance of the Executive Order of 1861 in creating the Uintah Valley Reservation and establishing certain rights for its Indian occupants, the subsequent treaties establishing the Uintah and Ouray Reservation and the Termination Act undoubtedly modified those rights. The Uintah Valley Reservation became the Uintah and Ouray Reservation. And then the Termination Act explicitly provided "for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah." 68 Stat. at 868. Thus, to determine whether the Uintah Valley Shoshone Tribe had the authority to issue licenses, we consider the language of the Termination Act and our decision interpreting this Act in *United States v. Felter*, 752 F.2d 1505 (10th Cir. 1985).

While the Termination Act terminated the membership of mixed-blood Ute Indians, it did not terminate certain rights, including their "remaining interest in . . . all other tribal assets not susceptible to equitable and practicable distribution."

68 Stat. at 876. Hunting and fishing rights are not "susceptible to equitable and practicable distribution," and because the Termination Act is silent on these rights, the Termination Act did not explicitly abrogate these rights. *See Felter*, 752 F.2d at 1509 (holding the Termination Act was not a "backhanded way of abrogating the hunting and fishing rights of mixed-blood Ute Indians"). Thus, mixed-blood Utes maintained their individual hunting and fishing rights even after their membership was terminated under the Termination Act.

But these hunting and fishing rights were limited by the treaties. First, our case law establishes that hunting and fishing rights are personal to the mixed-blood Utes included on the initial roll sheet and as such are "neither alienable, assignable, transferable nor descendible." *United States v. Von Murdock*, 132 F.3d 534, 538 (10th Cir. 1997) (quotations omitted). *See also* quoting *United States v. Felter*, 546 F. Supp. 1002, 1021 (D. Utah 1982) ("Tribal rights in property are owned by the tribal entity, and not as a tenancy in common of the individual members . . . including hunting and fishing rights."). Only "the individual enjoys a right of user derived from the legal or equitable property right of the tribe in which he is a member." F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.). Thus, only the original 490 mixed-blood members listed on the final rolls in 1956 had hunting and fishing rights on the Uintah and Ouray Reservation—these rights could not be passed down to their descendants. *See*

-9-

*Felter*, 546 F. Supp. at 1025 (citing F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.)) ("As each of the mixed-blood Utes passes away, his or her personal right of user is extinguished, it being neither inheritable or transferable.").

Second, only mixed-blood Utes acting in their individual capacity can exercise these hunting and fishing rights. Mixed-blood members cannot convert their rights of user in the Ute's tribal rights into separate tribal rights of the Uintah Valley Shoshone Tribe. The Termination Act states that the "mixed-blood *member*" retains certain tribal assets such as hunting and fishing rights. 68 Stat. at 876. The statute does not mention any property rights that inhere in a Uintah organization after partition and termination. In fact, jurisdiction over the tribal lands was established in the Ute Tribe.

And our cases make it clear that hunting and fishing rights formerly vested in the Uintah band were merged into and are part of the Ute Tribe. The Uintah Valley Shoshone Tribe, even if it maintains some organizational identity, has no formal, separate existence outside the Ute Tribe. Thus, any tribal right—like hunting and fishing—belongs to the Ute Tribe alone. Only the Ute Tribe can issue hunting and fishing licenses, and Uintah Valley Shoshone Tribe members not included on the original roll sheet of mixed-blood members have "no right of user in hunting and fishing rights originally granted to the Uintah Tribe." *Von*

*Murdoch*, 132 F.3d at 541; *see also Felter*, 752 F.2d at 1509 ("The right to hunt and fish on reservation land is a long-established *tribal right*" (emphasis added)).

Furthermore, the Termination Act established how these tribal assets were to be governed. The Act states the tribal assets "not susceptible to equitable and practicable distribution shall be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group." 68 Stat. at 873. As we recognized in *Felter*, these assets include hunting and fishing rights. Thus, the hunting and fishing rights of individual members are managed solely by the Ute Tribe and the mixed-blood representatives. This is a clear statutory indicator that the Termination Act did not provide any asset control to other organizations outside the Ute Tribe and the designated mixed-blood representative. As we noted in *Felter*, "[t]he right to hunt and fish on reservation land is a long-established tribal right" and the "[i]ndividual Indians . . . enjoy a right of user in the tribe's hunting and fishing rights." 752 F.2d at 1509. In this case, the United States does not dispute the rights of individual mixed-blood Utes who were listed on the original rolls to hunt and fish. The United States only disputes the Uintah Valley Shoshone Tribe's assertion of tribal authority to issue licenses in direct contradiction to the Termination Act.

This interpretation is supported by *Menominee Tribe v. United States*, 391 U.S. 404 (1968), which our court relied on in *Felter*. In that case, the Supreme

-11-

Court held the Menominee Indian Termination Act of 1954 did not abrogate hunting and fishing rights of the Menominee Indians because the Termination Act did not include an "explicit statement" abrogating individual hunting and fishing rights. *Id.* at 412–13. Thus, the Supreme Court "decline[d] to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians." *Id.*

We recognize that in interpreting federal statutes in Indian affairs we "provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited." *Felter*, 752 F.2d at 1512; *see also* F. Cohen, Handbook of Federal Indian Law 224–25 (1982). In *Felter*, we determined the hunting and fishing rights of the individuals were not abrogated because the statute did not clearly abrogate them—this is a narrowing construction. But we cannot also conclude that the Termination Act implicitly gave the Uintah Valley Shoshone Tribe authority to exercise Ute tribal rights with respect to hunting and fishing, when the Act plainly established those rights within the Ute Tribe.

In sum, we hold the Uintah Valley Shoshone Tribe lacks the authority to issue hunting and fishing licenses on the Uintah and Ouray Reservation to its members.

***B. The District Court Did Not Abuse Its Discretion in Denying a
Permanent Injunction.***

The district court declined to order a permanent injunction. The government

contends the court erred and that an injunction is necessary to stop the Uintah

Valley Shoshone Tribe from issuing licenses. It claims the organization violated

the federal wire fraud statute.

To obtain a permanent injunction, the United States must prove "(1) actual

success on the merits; (2) irreparable harm unless the injunction is issued; (3) the

threatened injury outweighs the harm that the injunction may cause the opposing

party; and (4) the injunction, if issued, will not adversely affect the public

interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th

Cir. 2007). We review the district court's decision to deny a permanent injunction

for abuse of discretion. *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1142

(10th Cir. 2008).

To succeed on the merits of a wire fraud claim—the first element of the

permanent injunction standard—the government must show "(1) a scheme or

artifice to defraud or obtain money by false pretenses, representations, or

promises; and (2) use of interstate wire communications to facilitate that scheme."

*United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997). "A scheme to

defraud by false representations may be accomplished by patently false statements

or statements made with a reckless indifference as to their truth or falsity, and

-13-

deceitful concealment of material facts may constitute actual fraud." *Id.* at 665.

"[E]ven though a defendant may firmly believe in his plan, his belief will not

justify baseless or reckless representations." *Id*.

The district court found no such scheme existed based on the factual

stipulations. The district court stated:

> Based on the agreed factual stipulations it is difficult for the Court to find such a scheme to obtain money by false representations and promises through the sale of licenses. [I]t appears to the Court the United States as trustee is entitled to a ruling so declaring [the absence of sovereign power in Defendants to issue hunting and fishing licenses], but denied relief by way of injunction because of the absence of evidence dealing with a criminal statute. It is clear from the history since Lincoln's time as a result of congressional and tribal action that Defendants have no power to issue licenses to hunt and fish on trust or Tribal lands. None. They should not do so, not because they have concocted a scheme to defraud purchases of such licenses, but because they simply lack power to issue such licenses.

*United States v. Uintah Valley Shoshone Tribe*, 2:17-cv-1140, 2018 WL 4222398,

at *6 (D. Utah Sept. 5, 2018). Because the district court determined the

government did not show actual success on the merits, the district court concluded

its analysis and declined to issue a permanent injunction.

When we review for abuse of discretion, we look to whether the district

court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable."

*Prairie Band Potawatomi Nation*, 476 F.3d at 822. Even if we disagree with the

district court's decision based on our own review of the record, or if we find the

-14-

district court's explanation minimal, we still defer to the district court and affirm its decision if the district court did not abuse its discretion.

Here, the district court concluded that no scheme existed—the Uintah Valley Shoshone Tribe was simply purporting to exercise authority it did not actually have. This is a reasonable conclusion. Even though the Uintah Valley Shoshone Tribe stated it was a federally recognized tribe and was doing business as the Ute Indian Tribe, it did not make these statements to obtain money through a scheme. Rather, the organization plausibly made these statements because it believed its members were allowed to hunt and fish on the lands, and it wants to preserve its cultural identity and protect members' alleged individual and tribal rights.

Given these conclusions by the district court, we find the court did not abuse its discretion in denying a permanent injunction. And to the extent the Tribe engages in future misconduct, the government is free to renew its request at that time.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court.