Donna Land MALDONADO and
Barbara Land Cuch, Plaintiffs,

v.

Donald P. HODEL, Ross O.
Swimmer, Defendants.

Civ. No. 86–C–1050G.

United States District Court,
D. Utah, C.D.

Feb. 19, 1988.

Mary Ellen Sloan, Gerald H. Kinghorn, Salt Lake City, Utah, for plaintiffs.

Margaret R. Nelson, William McConkie, Salt Lake City, Utah, for defendants.

Stephen G. Boyden, Salt Lake City, Utah, for Ute Indian Tribe.

George C. Morris, Salt Lake City, Utah, for Ute Dist. Corp.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

Plaintiffs, two "mixed-blood" Ute Indians, bring this action against the Secretary of the Interior and Assistant Secretary of the Interior for Indian Affairs, seeking declaratory relief arising out of termination of their status as federally-recognized Indians. Plaintiffs also seek declaratory relief regarding certain acts by the Federal defendants relating to the distribution of tribal assets to plaintiffs. The defendants re-

sponded by moving to dismiss the complaint.

On September 28, 1987, the court heard arguments on the motion. Mary Ellen Sloan and Gerald H. Kinghorn represented the plaintiffs. Margaret R. Nelson and William McConkie represented the defendants. Stephen G. Boyden appeared on behalf of the Ute Indian Tribe and George C. Morris appeared on behalf of the Ute Distribution Corporation, although neither entity was joined as a party defendant. The court took the matter under advisement and allowed the parties to file supplemental memoranda which were filed on October 15, 1987, and November 23, 1987. Being now fully advised, the court enters this memorandum opinion and order.

## I. FACTUAL BACKGROUND

In 1954, Congress passed the Ute Partition Act, codified as amended at 25 U.S.C. §§ 677–677aa (1982).[1] The purposes of the Act were (1) to partition and distribute the Ute Indian Tribal assets of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood groups; (2) to terminate Federal supervision of the mixed blood members' property; and (3) to assist the full-blood members to prepare for termination of federal supervision over their property. 25 U.S.C. § 677. The Act divided the Utah Indian Tribe of the Uintah and Ouray Reservation into two groups, identified by blood percentage. "Full-bloods" possessed one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half. "Mixed-bloods" were those who did not possess sufficient Indian or Ute Indian blood to be full-bloods and those full-bloods who chose to be classified as mixed-bloods. 25 U.S.C. § 677a(b) and (c).[2]

On April 5, 1956, final membership roles were published, listing 490 tribal members as mixed bloods and 1,314 tribal members as full-bloods. Finally, on August 27, 1961, the federal supervisory relationship over the 490 mixed-bloods terminated, and the Ute Indian Tribe consisted only of those classified as full-blood members.

Prior to termination of supervision over the mixed bloods, Congress established two classifications of tribal assets to be divided among members within the two groups, namely, those assets "susceptible to equitable and practicable distribution" and those not susceptible to equitable and practicable distribution. Those assets susceptible to equitable and practicable distribution were to be divided as agreed by the two groups based upon the relative number of persons comprising the final membership roll of each group. Those assets not susceptible to equitable and practicable distribution were to be managed jointly by the tribal business committee on behalf of the full bloods and the authorized representative of the mixed-blood group, and the proceeds therefrom were to "be divided between the full-blood and mixed-blood groups in direct proportion to the number of persons comprising the final membership roll of each group ..." 25 U.S.C. § 677i. A plan for division and distribution of these assets was adopted by both the mixed-blood and full-blood groups and approved by the Secretary pursuant to 25 U.S.C. § 677l.

As authorized by law, the mixed-bloods began implementation of the distribution plan by organizing under the name, Affiliated Ute Citizens of Utah (AUC), and by adopting a constitution approved by the Secretary.[3] The AUC board of directors

---

**1.** For a more detailed discussion of the Ute Partition Act, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 133–139, 92 S.Ct. 1456, 1462–1465, 31 L.Ed.2d 741 (1972); *United States v. Felter*, 546 F.Supp. 1002, 1004–06 (D.Utah 1982), *aff'd*, 752 F.2d 1505 (10th Cir.1985).

**2.** *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 133 n. 3, 92 S.Ct. 1456, 1462 n. 3, 31 L.Ed.2d 741 (1972), wherein the Court stated that, "For purposes of consistency and clarity," it felt compelled to use the statutory terms "full-blood" and "mixed blood."

**3.** 25 U.S.C. § 677e, in relevant part, provides:

The mixed-blood members of the tribe ... shall have the right to organize for their common welfare, and may adopt an appropriate constitution and bylaws which shall become effective when ratified by a majority vote of the adult mixed-blood members of the tribe at a special election ... such constitution may provide for the selection of authorized representatives who shall have power to take any action that is required by this subchapter to

represented the mixed-bloods throughout the entire termination process. The constitution and bylaws of the AUC empowered the board of directors to "irrevocably delegate to corporations or the officers thereof ... such powers and authority as may be necessary or desirable in the accomplishment of the objects and purposes for which said corporation may be so organized." Constitution and Bylaws of the Affiliated Ute Citizens of the State of Utah, Art. V, § 1(b). The AUC's board of directors, in accordance with their aforementioned authority and by unanimous vote, irrevocably delegated to the Ute Distribution Corporation (UDC) all their powers "for the purposes of managing jointly with the Tribal Business Committee of the full-blood group ... all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practical distribution ..." Preamble to the Articles of Incorporation of Ute Distribution Corporation.[4] The UDC was formed pursuant to 25 U.S.C. § 677i and was to receive all income belonging to the mixed-bloods from unadjudicated or unliquidated claims against the United States, all income

from oil, gas and mineral rights and all income from all other assets not susceptible to fair distribution. Each mixed-blood was to receive ten shares of stock, entitling the holder of the stock to vote for the mixed-blood delegates, and to share in the distribution of the proceeds from the jointly managed assets. However, upon the sale of his or her shares, the mixed-blood no longer would have a voice in the management of the undivided assets.[5]

When any mixed-blood member received his or her distributive share of assets distributed to the mixed-blood group under the provisions of 25 U.S.C. § 677i, the Secretary was authorized to remove all Federal restrictions on such property, and Federal supervision over such mixed-blood and his property terminated,

*"except as to his remaining interest in tribal property in the form of any unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other tribal assets not susceptible to equitable and practicable distribution, all of which shall remain subject to the terms of this subchapter, notwithstand-*

---

be taken by the mixed-blood members as a group.

4. The purposes of the UDC were also set forth in the Articles of Incorporation of the Ute Distribution Corporation, Art. IV, as follows:

[T]o manage jointly with the Tribal Business Committee ... all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members ... may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation as herein provided.

5. The Plan for Division of Assets, Art. VII, entitled, *Assets Not Susceptible to Equitable and Practicable Distribution,* in relevant part, provided:

It is proposed that a corporation be formed under the laws of the State of Utah to receive all income belonging to the mixed-blood group from the theretofore unadjudicated or unliquidated claims against the United States, all income from oil, gas and mineral rights of every kind and from all other assets not susceptible to equitable or practicable distribu-

tion. This corporation shall be organized not for the purpose of profit, but shall be incorporated with a view of complying with the tax exemption provisions of state and federal law with the major purpose of distributing to its stockholders the net revenues from such sources. Each person included upon the final mixed-blood roll as provided in ... [25 U.S.C. § 677g] will be issued ten shares of stock in said corporation. The stock of the corporation will be subject to transfer, devise or dissent. Officers of the corporation will be delegated authority from the stockholders for participation in the joint management of such assets from which the corporate income is derived, with the Tribal Business Community of the full-blood group. The powers of this corporation shall be limited to distribution of said assets and the powers necessarily incident thereto.

Delegation of management powers by the original stockholders will provide a means of restricting the management to the interested parties. Thus, if a mixed-blood member disposes of his stock he will no longer have a voice in naming the mixed-blood delegates to act with the Business Committee of the full-blood Indians. Conversely, transferees, legatees, and heirs will acquire a voice in such management as their interests are acquired.

*ing anything contained herein to the contrary."*

25 U.S.C. § 677*o* (a) (emphasis added).

Plaintiffs are members of the mixed-blood group who were terminated[6] and who, as a group, received their share of tribal assets. Plaintiffs' names appeared on the final membership roll of the mixed-blood group and each received ten shares of common stock in the UDC, representing their distributive share of assets not susceptible to equitable and practicable distribution, notably, oil and gas royalty income. Plaintiffs' interest in such income was represented by their shares of stock in the UDC. However, plaintiffs sold their UDC stock, knowing from the public record in the UDC Articles of Incorporation that they would no longer have a voice in the management of the corporation or be entitled to share in any corporate income.[7]

Plaintiffs now attack the 1961 termination and want a declaration by this court that they are entitled to receive the federal services available to "unterminated" Indians. They do not seek membership in the full-blood Ute Indian tribe. In short, as mixed bloods, plaintiffs wish to regain their status as federally recognized Indians. Although plaintiffs sold their stock in the UDC, they further request the court to rule that as individuals they still have an interest in those assets that are not susceptible to equitable and practicable distribution. Finally, plaintiffs seek the court to declare

that the Secretary breached fiduciary and statutory duties to plaintiffs, as members of the mixed-blood group, by approving a distribution plan which (1) authorized the UDC to manage the mixed-bloods' share of assets not susceptible to equitable and practicable distribution and (2) which authorized the free alienation of UDC stock. Specifically, plaintiffs claim that by approving the distribution plan, the Secretary violated 25 U.S.C. § 677*o* (a), which requires that those assets not susceptible to fair distribution remain under federal supervision.[8] In essence, plaintiffs assert that the secretary's actions were all *ultra vires* and beyond the scope of his authority.

## II. ANALYSIS

Before discussing plaintiffs' contentions, the court will first deal with the threshold questions arising from defendants' claim of sovereign immunity.

### A. *Jurisdiction—Sovereign Immunity —Statute of Limitations*

The federal defendants argue that plaintiffs' complaint is in fact against the United States and that the United States has not consented to such a suit. Therefore, defendants urge, the statute of limitations, 28 U.S.C. § 2401, which provides that *"every civil action commenced against the United States* shall be barred unless the complaint is filed within six years after the

---

**6.** Pursuant to 25 U.S.C. § 677v, upon the removal of federal restrictions of each mixed-bloods' property, the secretary was instructed to publish in the Federal Register a termination proclamation declaring that the federal trust relationship as to such individual had ended. On August 27, 1961, the secretary issued such a termination proclamation, ending the federal supervisory relationship over the 490 mixed-bloods.

**7.** Articles of Incorporation of the UDC, art. VI, provides:

The stock of the corporation is subject to transfer, devise or dissent. If a mixed-blood member of said tribe, or any stockholder herein disposes of his stock, he will no longer have a vote or any control in the affairs of the corporation, or be entitled to share in the distribution of the proceeds as herein before provided, unless and until he thereafter again becomes a stockholder in the corporation.

Transferees, legatees, and heirs of any stock in the corporation shall acquire all rights to which a stockholder is entitled, including voting rights and the right to share in the distribution of the income or proceeds available for such distribution.

**8.** The Ute Partition Act, the termination proclamation and formation of the UDC have resulted in numerous lawsuits. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Miera v. First Security Bank,* 776 F.2d 902 (10th Cir.1985); *United States v. Felter,* 752 F.2d 1505 (10th Cir.1985), *aff'g* 546 F.Supp. 1002 (D.Utah 1982); *Ute Indian Tribe v. Probst,* 428 F.2d 491 (10th Cir.), *cert. denied,* 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970); *Chapoose v. Clark,* 607 F.Supp. 1027 (D.Utah 1985); *Hackford v. First Security Bank,* 521 F.Supp. 541 (D.Utah 1981), *aff'd,* No. 81-1863, unpublished slip op. (10th Cir. Jan. 31, 1983).

right of action first accrues," time-bars the claims in plaintiffs' complaint. One of the conditions the Federal government has imposed in consenting to be sued is the time within which suit must be instituted, and failure to do so within the time specified "deprives the district court of jurisdiction." *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1357 (5th Cir.1972). Although plaintiffs filed their complaint on November 18, 1986, more than twenty-five years after the federal supervisory relationship over the mixed-bloods terminated, they claim that 28 U.S.C. § 2401 is not applicable because the action is not one against the sovereign.

▇▇▇ Plaintiffs have not sued the United States as such. Rather, they have sued federal officials: the Secretary of the Interior, Donald P. Hodel; and the Assistant Secretary of the Interior for Indian Affairs, Ross O. Swimmer. However, that fact alone does not prevent this from being an action against the sovereign.[9] Whether plaintiffs' claims against the federal defendants are claims against the United States depends on "the essential nature and effect of the proceeding, as it appears from the entire record." *Ex Parte New York*, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057 (1921). If a decree in plaintiffs' favor would " 'expend itself on the public treasury or domain, or interfere with public administration,' or if the effect of the judgment would be 'to restrain the government from acting, or to compel it to act,' " then this action is one against the United States as a sovereign. *See Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Panola Land Buyer's Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir.1985). On the other hand, if

the defendants have acted unconstitutionally or outside the scope of their statutory powers, a suit against them would not be a suit against the sovereign. *See e.g., Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 701–02, 69 S.Ct. 1457, 1467, 93 L.Ed. 1628 (1949); *Pankey Land and Cattle Co. v. Hardin*, 427 F.2d 43, 45 (10th Cir.1970). *See generally* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3655 at 227–30 & nn. 37–40 (2d ed. 1985 & Supp.1987) and cases cited therein.

In the case at bar, since plaintiffs seek only declaratory relief their claim would not "expend itself on the public treasury." But a decree in plaintiffs' favor might "interfere with the public administration" and "restrain the government from acting" if it would prevent the federal defendants from fulfilling their statutory obligations. Also, a decree in plaintiffs' favor may interfere with the Secretary's trust responsibility to manage the nondivisible trust assets under 25 U.S.C. §§ 677i, 677o, and may change the Secretary's duties regarding those assets. Resolution of these issues, and whether the acts of the defendants were unconstitutional or otherwise unlawful will depend upon a decision on the merits herein. Accordingly, this court concludes on the present state of the record that "this is the type of case where the question of [immunity and therefore] jurisdiction is dependent on decision of the merits." *Land v. Dollar*, 330 U.S. 731, 735, 67 S.Ct. 1009, 1011, 91 L.Ed. 1209 (1947).

### B. *Merits of the Case*

Reduced to essentials, plaintiffs' complaint raises three issues for the court to decide: (1) Did the Secretary breach fiduciary and statutory duties to plaintiffs, as

---

**9.** For example, in *Chapoose v. Hodel*, 831 F.2d 931 (10th Cir.1987), nineteen Indian children, claiming civil rights violations by federal officials for denying the children membership in the Ute tribe, in their complaint named as defendants certain federal officials and the successors in office. The court held that by specifically requesting that the individual successors be automatically named as party defendants

should the named defendants be replaced during pendency of the action, "the children have made clear that the onus of their suit is to impose liability on the office or the Agency. As such, it is a suit against the sovereign which is protected by sovereign immunity." *Id.* at 935. In this case, however, plaintiffs have not named the successors in office as defendants.

members of the mixed-blood group, by approving an asset distribution plan authorizing the formation of the UDC and the free alienability off UDC stock? (2) Did the Secretary's termination proclamation terminate the federal trust relationship over those assets not susceptible to equitable and practicable distribution in violation of 25 U.S.C. § 677*o* (a)? (3) Did plaintiffs, as members of the mixed-blood group terminated under the Act, lose their status as federally recognized Indians? All of these issues have been litigated, either expressly or impliedly, in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Since plaintiffs urge that this case is not controlled by *Affiliated Ute Citizens* the court will discuss and review that case before addressing each of the specific issues presented by plaintiffs. In *Affiliated Ute Citizens* the Supreme Court consolidated two Tenth Circuit cases for review. In the first case,[10] AUC sought a distribution to the individual mixed-bloods of their pro rata share of the mineral estate underlying the reservation. It also sought a determination that AUC and not UDC was entitled to manage that property jointly with the Tribal Business Committee. The Court rejected AUC's claim to participate in the joint management of the tribe's indivisible resources and recognized the validity of the UDC.[11] The court then held that the suit was properly dismissed for lack of subject matter jurisdiction because the United States, the only named defendant, had not waived its sovereign immunity. *Affiliated Ute Citizens*, 406 U.S. at 143, 92 S.Ct. at 1467.

In the second consolidated case,[12] eighty-five mixed-bloods sued various private parties for alleged violations, including charges based on Regulation 10b–5 of the Securities and Exchange Commission, in connection with the mixed-bloods' sale of UDC stock to non-Indians. Subsequently, the plaintiffs amended their complaint to include a cause of action against the United States. The United States was not charged with a 10b–5 violation, but plaintiffs "alleged a *breach of duty by the Secretary of the Interior* in connection with the transfer of the shares of stock." *Id.* at 1399–40 (emphasis added). The specific issue, as against the United States, was whether a provision in 25 U.S.C. § 677n (and incorpo-

**10.** *Affiliated Ute Citizens v. United States*, 431 F.2d 1349 (10th Cir.1970).

**11.** The Supreme Court said:

The Ute Partition Act was the result of proposals initiated by the tribe itself. See H.R.Rep. No. 2493, 83d Cong., 2d Sess., 2 (1954); S.Rep. No. 1632, 83d Cong., 2d Sess., 7 (1954). The tribe also drafted the Act. *Id.*, at 3 and 7, respectively. It provided for organization by the mixed-bloods and "for the selection of authorized representatives" with power to take any action the Act required to be taken by the mixed-bloods as a group. § 6, 25 U.S. C. § 677e. AUC was formed in 1956 and was the product of this organizational power. Its constitution and bylaws authorize the delegation of necessary or desirable power or authority to corporations formed by the mixed-bloods. UDC was formed by mixed-bloods in 1958 specifically to manage mineral rights and unadjudicated claims against the United States jointly with the business committee. AUC approved UDC's articles and by resolution delegated authority to UDC to act in accord with those articles.
These steps were taken pursuant to the Partition Act. UDC's formation and structure were contemplated by the Act, and AUC itself created and breathed life and vigor into UDC. All this was within Congress' power. *United States v. Waller*, 243 U.S. 452, 462 [37 S.Ct. 430, 433, 61 L.Ed. 843] (1917); *Tiger v. Western Investment Co.*, 221 U.S. 286 [31 S.Ct. 578, 55 L.Ed. 738] (1911). UDC's legitimacy was further recognized by its anticipatory exemption from federal income tax, under the Act of August 2, 1956, § 3, 70 Stat. 936; by the freeing of its shares from mortgage, levy, attachment, and the like, so long as the shares remained in the ownership of the original shareholder or his heirs or legatees, under the Act of September 25, 1962, 76 Stat. 597, 598; and by the inclusion of UDC by name as an entity to receive the trust fund resulting from the judgment against the United States in favor of the Confederated Bands of Ute Indians, under the Act of August 1, 1967, 81 Stat. 164, as amended, 82 Stat. 171, 25 U.S.C. § 676a. *Clearly, it is UDC and not AUC that is entitled to manage the oil, gas, and mineral rights with the committee of the full-bloods.*
*Id.* at 143–144, 92 S.Ct. at 1467. (emphasis added).

**12.** *Reyos v. United States*, 431 F.2d 1337 (10th Cir.1970).

rated in the UDC Articles of Incorporation) requiring that if UDC stock was to be sold before August 27, 1964, it should first be offered to tribal members, created a duty on the part of the Government; and if so whether the government had breached such duty.[13] The Supreme Court ruled that the termination had been properly accomplished and that the United States had no responsibility for sales of UDC stock thereafter. The Court said:

> The [plaintiffs'] argument that the right of first refusal created a duty on the part of the Government does not persuade us. This first-refusal right with respect to UDC stock is provided for in the corporation's articles and thus was created by UDC itself. The corporation's action in this respect imposed no duty on the United States.

**13.** The Tenth Circuit in *Reyos* had held that the Government did not breach any duty to the mixed-blood plaintiffs by permitting them to sell their shares of UDC stock after termination became effective in 1961:

> The provision in the Articles of Incorporation that if the stock was to be sold before August 27, 1964, it should first be offered to "members of the Tribe," constitutes no more than a typical right of refusal in the members of the tribe or in the tribe. It was somewhat more difficult to carry out by reason of the fact that notice had to be given to a fairly large number of individuals and provision had to be made to advise the prospective seller that his offer had or had not been accepted by the members of the Tribe. This the Bureau of Indian Affairs undertook to do. It was also necessary if an offer was not accepted, and the prospective seller completed the sale to a stranger, to demonstrate to the Tribe or its members that the sale was in accordance with the offer made to them. This was done by an affidavit executed by the seller stating the sales price received ...
>
> The right of refusal thus created no duty on the part of the Government to the then terminated mixed-blood plaintiffs who were seeking to sell their shares of stock.

*Reyos* 431 F.2d at 1342–43.

**14.** The distribution plan proposed

> [T]hat a corporation be formed under the laws of the State of Utah to receive all income belonging to the mixed-blood group from the theretofore unadjudicated or unliquidated claims against the United States, all income from oil, gas and mineral rights of every kind and from all other assets not susceptible to equitable or practicable distribution.

*Affiliated Ute Citizens*, 406 U.S. at 150, 92 S.Ct. at 1470. The court now address the specific issues presented.

### 1. The Secretary's Approval of the UDC

■ Plaintiffs claim that the distribution plan approved by the Secretary was not in compliance with the Ute Partition Act.[14] Because the distribution plan specifically contemplated the formation of the UDC, it is the organization of the UDC that is at issue here. But the Supreme Court specifically approved the formation of the UDC and the distribution plan as accomplishing the purposes of the Ute Partition and Termination Act. *Affiliated Ute Citizens*, 406 U.S. at 136, 92 S.Ct. at 1463.[15] In this regard, the Supreme Court said: "UDC's

> Plan for Distribution of the Assets of the Individual Mixed–Blood Members of the Ute Indian Tribe, Uintah and Ouray Reservation, Utah, Pursuant to Public Law 671, 83rd Congress—2nd Session (68 Stat. 868) and For Other Purposes, Article VII at 5–6.

**15.** The Supreme Court commented upon the organization of the UDC as follows:

> UDC was incorporated in 1958 with the stated purpose "to manage jointly with the Tribal Business Committee of the full-blood members of the Ute Indian Tribe ... all unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members of the said tribe ... are now, or may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation...."
>
> The formation of UDC was part of the plan formulated by the mixed-bloods for the distribution of assets to the individual members of their group. By a resolution adopted by a 42–5 vote at a special meeting at which a quorum was present and voting, AUC approved the articles of UDC. The Secretary also approved them. In January 1959 the AUC directors by a unanimous vote (5–0) irrevocably delegated authority to UDC ... to accomplish the purposes for which [it was] formed. UDC then issued 10 shares of its capital stock in the name of each mixed-blood Ute, a total of 4,900 shares.

*Affiliated Ute Citizens*, 406 U.S. at 136, 92 S.Ct. at 1463–1464.

formation and structure were contemplated by the Act, and AUC itself created and breathed life and vigor into UDC. All this was within Congress' Power." *Id.* at 143–44, 92 S.Ct. at 1467.

Plaintiffs, as members of AUC that voted in favor of UDC organization twenty-nine years ago, cannot now complain that the UDC was organized illegally. Indeed, when plaintiffs sold their UDC stock they received the benefit of their bargain. Presumably, they were compensated for the value their stock represented, including the right to participate in the management of the nondistributable assets and distribution of the proceeds. Accordingly, plaintiffs' claims in this case based upon alleged illegalities in the Secretary's approval of UDC organization are dismissed.

### 2. Termination of Trust Relationship over Nondivisible Assets

■ Plaintiffs claim that the termination proclamation terminated the trust relationship over the indivisible assets. However, the Ute Partition and Termination Act provides that those tribal assets not susceptible to equitable and practicable distribution shall remain subject to federal supervision. 25 U.S.C. § 677*o* (a).

Resolution of this issue is inseparably related to an important distinction between the indivisible assets and the UDC stock itself. The termination proclamation terminated federal supervision over the trust and restricted property of the mixed-bloods. It did not terminate the trust relationship over those tribal assets not susceptible to equitable and practicable distribution. The termination proclamation "obviously included the shares of UDC although the undivided interests in turn held by UDC and shared with the full-bloods remained subject to restrictions after the proclamation." *Affiliated Ute Citizens,* 406 U.S. at 150, 92 S.Ct. at 1470. Unlike the nondistributable assets which are still held in trust by the United States,[16] the UDC stock itself "was free of restriction; as to it, federal termination was complete.... There was no remaining governmental authority over those shares." *Id.*

### 3. Plaintiffs' Status as Federally Recognized Indians

■ The Ute Partition and Termination Act provides expressly for the termination of the federal trust relationship to the mixed-bloods. Upon termination, all mixed-blood members were no longer

entitled to any of the services performed for Indians *because of his status as an Indian.* All statutes of the United States which affect Indians *because of their status as Indians* shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several states shall apply to such persons in the same manner as they apply to other citizens within their jurisdiction.

25 U.S.C. § 677v (emphasis added). Plaintiffs are members of the mixed-blood group

---

**16.** The United States held the indivisible assets in trust for the Ute Indian Tribe prior to the termination proclamation, and still holds such assets in trust for the Ute Indian Tribe today. The Supreme Court determined that there is "no dispute that *the United States holds title to the land, including the mineral interest, constituting the Uintah and Ouray Reservation." Affiliated Ute Citizens,* 406 U.S. at 141, 92 S.Ct. at 1466 (emphasis added). Plaintiffs claimed the United States consented to be sued in 25 U.S.C. § 345, which in general gives Indians who claim to have been denied or excluded from any allotment of land the right to sue in federal court. The court rejected the argument and concluded that the mineral estate in dispute remained tribal property:

Although the interest in the mineral estate that AUC seeks to have conveyed pro rata to the individual mixed-bloods perhaps could be made the subject of an allotment, it has never been so subjected. Neither is it appurtenant to an allotment. The interest relates to the tribal land of the reservation. It remains tribal property. Further, § 10 of the 1954 Act, 25 U.S.C. § 677i, itself contemplates and provides specifically for the non-allocation of that interest.

406 U.S. at 142–43, 92 S.Ct. at 1467.

who were terminated under the Act. Plaintiffs seek "Indian" status, not membership in the full-blood tribe. Because 25 U.S.C. § 677v terminates the mixed-bloods' entitlement to federal services "because of their status as Indians," and federal jurisdiction over them "because of their status as Indians," the court concludes that a decree in plaintiffs' favor on this issue would be contradictory to the Act itself. Thus, the court holds that plaintiffs, as members of the mixed-blood group terminated under the Act, lost their status as federally recognized Indians within the meaning of the statute. The court's ruling on this issue is consistent with text of the Act itself, as well as with the reasoning of the Supreme Court. The termination proclamation "stated specifically that the mixed-blood thereupon 'shall not be entitled to any of the services performed for Indians because of his status as an Indian.'" *Affiliated Ute Citizens,* 406 U.S. at 150, 92 S.Ct. at 1470.[17]

Based upon the aforesaid analysis, defendants' Motion to Dismiss is granted. Counsel for defendants are directed to prepare and submit to the court a form of judgment consistent with this Memorandum Decision and Order after compliance with local Rule 13(e).

IT IS SO ORDERED.

---

**17.** In view of the court's holding on the merits of plaintiffs claims, it is not necessary to address defendants' argument that the Ute Indian Tribe is an indispensable party to this action.