UTE DISTRIBUTION CORPORATION, a Utah corporation, Floyd and Helen Wilkerson, Henry Wopsock, Sam N. and Sandra K. Aloia, and Chris H. Denver, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 88–C–0023G.

United States District Court, D. Utah, C.D.

July 27, 1989.

Max D. Wheeler, Michael D. Blackburn and David Steffensen, Salt Lake City, Utah, for plaintiffs.

Kirk C. Lusty, Washington, D.C., for defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came on regularly for trial before the court sitting without a jury on November 7 and 8, 1988. Max D. Wheeler, Michael D. Blackburn and David W. Steffensen represented the plaintiffs, and Kirk C. Lusty represented the defendant. The parties presented evidence and the court heard arguments of counsel. The court took the matter under advisement, but the parties were granted leave to file supplemental memoranda, with the understanding that upon filing thereof the case was to be submitted for decision by the court without further argument. Such further memorandums have been filed, and now being fully advised, the court enters its memorandum decision and order.

## NATURE OF THE ACTION

This is an action instigated by the Ute Distribution Corporation (hereinafter "UDC") and four of its stockholders. Plaintiffs Helen Wilkerson and Sandra Aloia are original mixed-blood stockholders of UDC; Henry Wopsock is a full-blood Ute Indian and an original stockholder of UDC who elected to be terminated from the tribe pursuant to the Act. He also acquired five additional shares of UDC stock by inheritance; Chris Denver is a non-Indian who purchased three shares of UDC stock. These individual plaintiffs seek a refund of federal income taxes assessed against them on income distributions received from UDC for the tax year 1984. Plaintiff UDC seeks an order from this court which would require the IRS to refund monies assessed against UDC under 26 U.S.C. §§ 6652(a) and 6678(b)(1) for its failure to file Form 1099 in tax years 1984 and 1985. Plaintiff UDC also seeks a declaratory judgment that it has no obligation under 26 U.S.C. §§ 6041(a) and 6042(c) to file Form 1099 for payments to be made in the future.[1]

## I. FACTUAL BACKGROUND

A. *Assets Not Susceptible to Equitable and Practicable Distribution under the Management of Ute Distribution Corporation (UDC)*

During the 1950s federal Indian policy underwent significant reform when Congress passed legislation to reduce federal involvement in Indian affairs.[2] In this regard, in 1954, Congress passed the Ute Partition Act (hereinafter the "Act"), codified as amended at 25 U.S.C. §§ 677–677aa (1982).[3] The purposes of the Act were (1)

---

1. Plaintiffs have exhausted their administrative remedies with the IRS by appealing to the IRS Appeals Office. Moreover, each individual plaintiff and UDC have paid in full the respective taxes and penalties with interest.

2. *See* Wilkinson & Biggs, "The Evolution of the Termination Policy," 5 American Indian L.Rev. 139, 145–165 (1977); F. Cohen, Handbook of Federal Indian Law 152–80 (1982).

3. There has been a considerable amount of litigation regarding the Ute Partition and Termination Act. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Miera v. First Security Bank,* 776 F.2d 902 (10th Cir.1985); *United States v. Felter,* 752 F.2d 1505 (10th Cir.1985), *aff'd,* 546 F.Supp. 1002 (D.Utah 1982); *Ute Indian Tribe v. Probst,* 428 F.2d 491 (10th Cir.) *cert. denied,* 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970); *Cha-*

to partition and distribute the Ute Indian Tribal assets of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood groups; (2) to terminate federal supervision of the mixed-blood members' property; and (3) to assist the full-blood members to prepare for termination of federal supervision over their property. *Id.* § 677. On August 27, 1961, federal supervisory relationship over the mixed-bloods was ended, and the Ute Indian Tribe consisted only of those classified as full-blood members.[4] However, federal supervision over the mixed-blood members and their property was not terminated "as to [their] remaining interest in ... tribal assets not susceptible to equitable and practicable distribution." *Id.* § 677o(a).[5] Those assets were to be managed jointly by the Tribal Business Committee on behalf of the

full-bloods and the authorized representative of the mixed-blood group, and the proceeds therefrom were to be "divided between the full-blood and mixed-blood groups in direct proportion to the number of persons comprising the final membership roll of each group...." *Id.* § 677i.

A plan for the division and distribution of assets which were distributable i.e., real and personal property, was adopted by both groups and approved by the Secretary of Interior. *Id.* § 677l. UDC was to receive all income belonging to the mixed-bloods from all other assets not "susceptible to an equitable and practicable distribution," as well as all income from unadjudicated or unliquidated claims against the United States, and all income from oil, gas and mineral rights.[6] As part of the distri-

---

*poose v. Clark,* 607 F.Supp. 1027 (D.Utah 1985); *Hackford v. First Security Bank,* 521 F.Supp. 541 (D. Utah 1981), *aff'd,* No. 81–1863, unpublished slip op., 1983 WL 20180 (10th Cir. Jan. 31, 1983).

4. In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 133 n. 3, 92 S.Ct. 1456, 1462 n. 3, 31 L.Ed.2d 741 (1972), the Court stated that, "[f]or purposes of consistency and clarity" it felt compelled to use the statutory terms "full-blood" and "mixed-blood." Pursuant to the Act, the Ute tribe was divided into two groups: full-blood members (those with one-half degree of Ute Indian blood and total Indian blood in excess of one-half) and mixed-blood members (those with insufficient Indian or Ute blood to qualify as full-blood Utes, and those full-blood Utes who elected to be treated as mixed-blood members). *Id.* § 677a(b) and (c). The Act required the preparation of final tribal rolls listing the full-blood and mixed-blood members of the Tribe. *Id.* § 677g. On April 5, 1956, these rolls were published in the Federal Register, listing 490 tribal members as mixed-bloods and 1,314 tribal members as full-bloods. 21 Fed.Reg. 2208–12. The Act provided that upon publication of the roles, "the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter." *Id.* § 677d.

5. The statute provides in part that:
   *When any mixed-blood member of the tribe has received his distributive share of the tribal assets distributed to the mixed-blood group* under the provisions of section 677i of this title, ... the Secretary is authorized and directed to immediately *transfer to him unrestricted control of all other property held in trust for such mixed-blood member by the United States,* and

shall further remove all restrictions on the sale or encumbrance of trust or restricted property owned by such member of the tribe, and Federal supervision of such member and his property shall thereby be terminated, *except as to his remaining interest in tribal property in the form of any unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other tribal assets not susceptible to equitable and practicable distribution, all of which shall remain subject to the terms of this subchapter, notwithstanding anything contained herein to the contrary.*
25 U.S.C. § 677o(a) (emphasis added).

6. The mixed-bloods organized under the name Affiliated Ute Citizens of Utah (AUC). The AUC was to represent the mixed-bloods throughout the entire termination process. The AUC's board of directors delegated to UDC all their powers "for the purposes of managing jointly with the Tribal Business Committee of the full-blood group ... all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution ..." The purposes of UDC are set forth in Art. IV of the Articles of Incorporation of the Ute Distribution Corporation, as follows:
   [T]o manage jointly with the Tribal Business Committee ... all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members ... may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation as herein provided.

bution plan, each mixed-blood was to receive ten shares of stock which entitled the holder to vote for mixed-blood delegates and to share in the proceeds of the jointly managed assets. However, when a mixed-blood sold his or her shares that person no longer would have a voice in management of the undivided assets or any rights therein.[7]

### B. Taxation of UDC Distributions Which Were Derived From Tribal Assets Not Susceptible to Equitable and Practicable Distribution

Department of Interior policy over the years has been to regard UDC distributions as tax-exempt.[8] The Internal Revenue Service has asserted a different position, but none of the plaintiffs or persons similarly situated have ever paid taxes on their UDC distributions, except under protest in connection with this current litigation. In the fall of 1982, Mr. Juan Bailli, an IRS field agent, asserted for the first time the probable taxable status of UDC distributions in the hands of stockholders and that UDC might have to file informational returns. This position was later formalized in an opinion letter dated March 3, 1983, by Randal G. Durfee, an IRS attorney who was assigned to investigate the tax conse-quences surrounding UDC distributions. In that opinion letter, Mr. Durfee determined:

> [T]here is no basis for distinguishing distributable and nondistributable assets or property for the purposes of this exemption and that it was the intent of Congress in terminating federal supervision over the mixed-blood trust assets to treat the mixed-bloods as non-Indians. Therefore, we believe that any distribution made to a mixed-blood after August 27, 1961 was and is subject to income tax.[9]

### C. Filing of Tax Returns or Forms by UDC

Agent Durfee also held in his written opinion that UDC was required to file 1099 returns under Treasury Regulation § 1.6041–1(b). During cross examination at trial, however, Mr. Durfee admitted that UDC did not qualify under any of the enumerated provisions of that regulation, nor was it a corporation engaged in the pursuit of gain or profit.[10] Further, when Mr. Durfee was presented with a "1099 DIV" form he agreed that UDC distributions could not properly be classified as "dividends" nor could its distributions accurately be recorded on any portion of the "1099 MIS" form.[11] Mr. Durfee agreed that

---

*See also* Preamble to the Articles of Incorporation of Ute Distribution Corporation.

**7.** Articles of Incorporation of UDC, Art. VI, provides:

> The stock of the corporation is subject to transfer, devise or descent. If a mixed-blood member of said tribe, or any stockholder herein disposes of his stock, he will no longer have a vote or any control in the affairs of the corporation, or be entitled to share in the distribution of the proceeds as herein before provided, unless and until he thereafter again becomes a stockholder in the corporation. Transferees, legatees, and heirs of any stock in the corporation shall acquire all rights to which a stockholder is entitled, including voting rights and the right to share in the distribution of the income or proceeds available for such distribution.

**8.** This policy and position of the Department of Interior, which has the oversight responsibility for the Ute Indian Tribe and UDC, is set forth in a letter from William R. McConkie for Reid W. Nielsen, Regional Solicitor, to the Superintend-ent, Uintah and Ouray Agency (February 10, 1983).

**9.** *See* letter from Randal G. Durfee, District Counsel to District Director, Salt Lake City (March 3, 1983). In further explaining his conclusion that all distributions made from the non distributed assets became taxable after August 1961, Mr. Durfee testified at trial as follows:

> Q. [Plaintiffs counsel] Did you rely on any legal authority or precedent or legislative history on concluding the seven year provision applied also to the trust properties?
> A. Only the legislative history behind the Act dealing with the Ute Tribe.
> Q. And what legislative history specifically?
> A. I don't remember. It was the general tone and tenor of the Act or the intention to terminate the stewardship with respect to the mixed-blood Indians.

Trial Transcript (Tr) Vol 1 at 75.

**10.** Tr. Vol. 1 at 72–77.

**11.** Tr. Vol. 1 at 78. In supporting the proposition that UDC distributions are not properly classified as dividends, Mr. Glen Lambert, a tax

UDC is a totally unique corporation unlike any in the United States.[12]

UDC advisors met several times with the IRS, culminating in a meeting on June 21, 1984 with John Oys, then Acting District Director for the IRS, who told UDC advisors that the IRS would consider dropping further attempts to assess taxes on UDC distributions. However, in August 1986, the IRS began audits of UDC and its stockholders.

## II. ANALYSIS

### A. *Taxation of Distributions by UDC*

The Ute Partition Act governs the taxable status of distributions by UDC. Section 677p of the Act provides:

> *No distribution of the assets made under the provisions of this subchapter shall be subject to any Federal or State income tax: Provided;* That so much of any cash distribution made under this subchapter as consists of a share of any interest earned on funds deposited in the Treasury of the United States shall not by virtue of this subchapter be exempt from individual income tax in the hands of the recipients for the year in which paid. *Property distributed to the mixed-blood group pursuant to the terms of this subchapter shall be exempt from property taxes for a period of seven years* from August 27, 1954, unless the original distributee parts with title thereto, either by deed, descent, succession, foreclosure of mortgage, sheriff's sale or other conveyance: *Provided;*
>
> That the mortgage, hypothecation, granting of right-of-way, or other similar encumbrance of said property shall not be construed as a conveyance subjecting said property to taxation under the provisions of this section. *After seven years from August 27, 1954, all property distributed to the mixed-blood members of the tribe* under the provisions of this subchapter and *all income derived therefrom* by the individual, corporation, or other legal entity, *shall be subject to the same taxes, State and Federal, as in the case of non-Indians;* except that any corporation organized by the mixed-blood members for the purpose of aiding in the joint management with the tribe and in the distribution of unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution *shall not be subject to corporate income taxes.*

(Emphasis added.)

Plaintiffs contend that the language of section 677p grants any UDC stockholder, whether a full-blood, mixed-blood or non-Indian, a complete tax exemption on distributions of income generated by undivided tribal assets not susceptible to equitable and practicable distribution, which assets continue to be held in trust by the United States government.[13] Plaintiffs urge that *only property which is actually distributed by transfer of title* to the mixed-bloods, and *the income directly derived from*

---

accountant with the firm of Deloitte, Haskins & Sells, testified:

> Q. [Plaintiff's counsel] Now Mr. Lambert, you are familiar, are you not, with the various 1099 forms that are prepared by the IRS for filing?
> A. Yes.
> Q. And you heard discussion about the 1099 DIV yesterday?
> A. Right.
> Q. Would you agree with Mr. Durfee that is not a form that fits UDC's function?
> A. Yes, I would.
> Q. In other words, the distributions, whatever they are, they are not dividends?
> A. I agree with that, yes.
> Tr. Vol. 2 at 35.

**12.** Tr. Vol. 1 at 61, 79.

**13.** In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 142–43, 92 S.Ct. 1456, 1466–67, 31 L.Ed.2d 741 (1972), the Supreme Court stated that "There is, and can be, no dispute that the United States holds title to the land, including the mineral interest, constituting the Uintah and Ouray Reservation ... Although the interest in the mineral estate that AUC seeks to have conveyed pro rata to the individual mixed-blood perhaps could be made the subject of an allotment, it has never been so subjected. Neither is it appurtenant to an allotment. The interest relates to the tribal land of the reservation. It remains tribal property. Further, § 10 of the 1954 Act, 25 U.S.C. § 677i, itself contemplates and provides specifically for the non-allocation of that interest." *See also Maldonado v. Hodel,* 683 F.Supp. 1322, 1329 (D.Utah 1988).

*such property*, is susceptible to taxation. The express language of section 677p provides for an exemption from *property* taxes on assets distributed by transfer of title during the period 1954–1961. Plaintiffs admit that the said *property tax exemption* does not apply to property distributed by passage of title after 1961. However, plaintiffs submit that the general exemption granted by the statute in the first sentence of section 677p is not modified or removed by any subsequent provision of section 677p as it relates to income distributions derived from assets held in trust by the government.

Defendant agrees that property distributed by transfer of title prior to August 1961 is expressly exempt from property taxes, but asserts that *all* property distributed after that time is taxable whether such property is distributed by transfer of title or otherwise. Defendant's position simply is that all UDC distributions to its shareholders after August 1961, the initial seven year period, are fully taxable.

Plaintiffs' position rests upon an interpretation of "property distributed" within the meaning of section 677p as excluding any distributions of income derived from nondistributable property held in trust by the government. The term "property distributed" appears in the statute twice, once with reference to distributions during the first seven year period after enactment of the statute, and once with reference to distributions after the initial seven year period. It is clear under the statute that "property distributed" to mixed bloods during the first seven years after enactment of the statute, until 1961, "shall be exempt from *property* taxes." On the other hand, it is equally clear under the statute that "*all* property distributed" after the seven year period and "all income derived therefrom ... shall be subject to the same *taxes*, State and Federal, as in the case of non-Indians." The only exemption granted under the statute after the initial seven year period is as to *corporate income taxes* which might otherwise be imposed upon corporations (such as UDC) organized by the mixed-blood members to aid in distributions, among other things, of assets "not susceptible to equitable and practicable distributions." Under the Act, the term "asset" is parallel in meaning with the term "property" and expressly embraces property held in trust by the United States.[14]

■ This court rejects plaintiffs' contention that the term "property distributed," as it appears the second time in section 677p relating to distributions after the initial seven year period, must be read as excluding distributions derived from property held in trust by the U.S. Government.[15] Likewise, this court rejects the argument that it is bound by the apparent prior administrative practice of not challenging UDC distributions as taxable.[16]

---

**14.** The Act defines "asset" to mean "all property of the Tribe, real, personal or mixed, whether held by the tribe or by the United States in trust for the tribe...." 25 U.S.C. § 677a.

**15.** It is urged by plaintiffs that since neither mixed-bloods nor corporations organized for their benefit were to receive "title" to any of the nondivisible assets under 25 U.S.C. § 677i & § 677o, Congress must have used the term "property distributed" in § 677p to distinguish between assets distributed by passage of title and nondivisible assets which remain in government trust. From this premise plaintiffs argue that as to distributions of property beyond 1961, the term "property distributed" only has application to assets which may be distributed by passage of title. Plaintiffs argue that Congress expressly exempted property capable of physical division and distribution by transfer of title from *property* taxes during the first seven years, and that its intent was to end that exclusion as applied to such "property distributed" after the initial seven year period, leaving undisturbed the initial exemption as applied to distributions of income derived from assets held in trust. Under the plain reading of the statute, however, section 677p authorizes the imposition of all applicable taxes, whether property taxes or otherwise, upon *all* property distributed after the initial seven year period, including income distributions, whether or not the distributions require transfer of title and irrespective of whether such distributions are derived from or relate to properties the title of which is retained by the U.S. Government under a trust arrangement.

**16.** The past administrative history does not rise to the level of clear administrative interpretation by way of published regulations as distinguished from unpublished policies twice removed from the statement of congressional policy set forth in the statute. In any event, courts are not bound to follow administrative determi-

Also, the court is unaware of any reason not to tax UDC property distributions to mixed bloods beyond 1961 based upon their status as "mixed bloods,"[17] nor can this court perceive a compelling public policy which requires non taxability under section 677p upon the basis that Indian statutes are typically construed liberally.[18]

■ Insofar as it relates to the taxable status of property distributions after 1961, the statute in question is unambiguous. The statute is neither silent nor ambiguous in that regard, and the court determines that Congress left no gap to be filled by administrative interpretation.[19] Under the plain reading of the statute, *all* property which is distributed to the mixed-bloods is subject to "the same taxes, State and Federal, as in the case of non-Indians." This embraces distributions of income from trust assets as well as all other property distributed to UDC stockholders, including mixed-bloods. This court so holds.

■ Although today this court has ruled that UDC distributions are taxable, as a matter of fundamental fairness this ruling shall apply prospectively only. That is, the taxable status of UDC distributions as applied to individual shareholders shall commence with the tax year 1989.

### B. *Filing Requirements of UDC*

Plaintiff UDC contends that it is entitled to a refund of tax penalties assessed against it for failing to file 1099s in tax years 1984 and 1985. UDC argues that since it does not generate profits or earnings for its shareholders, and does not have any control in determining how the income is distributed, it is not a "trade or business" under 26 U.S.C. § 6041(a).[20] It is further argued that UDC has no duty to file a return pursuant to 26 U.S.C. § 6042(c) since its distributions are not properly classified as "dividends" because the income produced does not originate

---

nations which are found to be inconsistent with the statutory mandate or that frustrate the congressional policy underlying a statute. *United States v. Felter,* 546 F.Supp. 1002 (D.Utah 1982) *aff'd,* 752 F.2d 1505 (10th Cir.1985); *Plateau, Inc. v. Department of Interior,* 603 F.2d 161 (10th Cir.1979). See Fn. 19.

**17.** Here, the status of *any person* as a stockholder of UDC controls. Mixed bloods who were original stockholders were allowed to transfer their shares with the understanding that thereafter they would have no further rights based upon those shares. "Transferees, legatees and heirs" were to acquire "all rights to which a stockholder is entitled, including voting rights and the right to share in the distribution of the income or proceeds available for such distribution." Articles of Incorporation of UDC, Article VI. The case of *United States v. Felter,* 546 F.Supp. 1002 (D.Utah 1982), *aff'd,* 752 F.2d 1505 (10th Cir.1985) is inapposite. In that case the Tenth Circuit held that a mixed-blood Ute Indian who was terminated under the Ute Partition Act did not lose her status as an Indian for purposes of hunting and fishing on reservation lands without a Tribal permit. The issue of status as an Indian is not present in the case at bar.

**18.** The court recognizes the "eminently sound and vital canon" set forth in *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797, n. 7, 48 L.Ed.2d 274 (1976), that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally con-

strued, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Also, the court is not unaware of the general rule that " '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), *quoting, Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). These general expressions have no compelling application in the circumstances of this case.

**19.** Where Congress has directly spoken to the precise question, agencies as well as the court must give effect to such unambiguously expressed intent. Here, Congress has directly spoken to the taxability of all property distributed after the initial seven year period. See *Chevron USA, Inc. v. Natural Resource Defense Council,* 467 U.S. 837, 842–844, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431–32, 107 S.Ct. 1207, 1213–14, 94 L.Ed.2d 434 (1987). *See also Salt Lake City, et al. v. Western Area Power Administration, et al.,* Slip op. C86–1000G at 2–32, 1988 WL 167244 (1988).

**20.** 26 U.S.C. § 6041(a) requires all persons engaged in a "trade or business" who make payments of $600.00 or more in a tax year to file a 1099 return.

from corporate earnings or profits.[21] UDC maintains that it is merely a conduit by which the income generated from the undivided tribal assets are passed on to the individual shareholders.

The term "trade or business" is not defined in the Internal Revenue Code or in its accompanying regulations. Further, the Code sections and Regulations cited by defendant provide no additional insight in helping the court resolve the issue since none of them can be construed to apply to such a unique corporation as UDC. Indeed, the evidence presented at trial contradicts defendant's contention that UDC is engaged in a "trade or business." "Dividend" is defined to mean any distribution of property made by a corporation to its shareholders "out of its earning and profits of the taxable year."[22] The IRS admits that UDC distributions to its stockholders do not constitute "dividends" because they do not originate from any corporate earnings or profits. Since UDC does not operate as a "trade or business," and since its distributions do not constitute "dividends," or other income, this court holds that UDC need not file 1099 informational tax returns or other forms.

Based upon the foregoing analysis, plaintiff UDC's claim for refund of penalties paid for its failure to file 1099 returns for tax years 1984 and 1985 is granted, and refunds to UDC for those years is ordered. The claims of the individual plaintiffs seeking tax refunds for the year 1984 is also granted.[23] However, commencing with the tax year 1989, all distributions of property and income to stockholders of UDC are declared to be taxable, that is, "subject to the same taxes, State and Federal, as in the case of non-Indians."

Counsel for defendant is directed to prepare and lodge with the court a form of judgment consistent with this Memorandum Decision and Order, after compliance with local Rule 13(e).

IT IS SO ORDERED.

---

**21.** 26 U.S.C. § 6042(a)(1) and (2) requires persons who make payments of dividends of $10.00 or more to any other person during any calendar year to file a return with the Secretary of the Treasury showing the name and address of the recipient and the amount of the payment.

**22.** 26 U.S.C. § 316.

**23.** Plaintiffs paid the 1984 assessments under protest and in spite of the longstanding position of the Department of the Interior that such distributions are non taxable. Under such circumstances the individual plaintiffs and other UDC stockholders are not charged with notice of the taxable status of such distributions prior to this decision.