ESTATE OF ROBERT POLETTI, DECEASED, LABARBARA T. POLETTI, PERSONAL REPRESENTATIVE & LABARBARA T. POLETTI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11500-90.        Filed November 9, 1992.

*D. James Manning* and *Kent Arthur Higgins,* for petitioners.

*Joel A. Lopata,* for respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency of $1,538 in petitioners' income tax for the year 1983. Petitioners are LaBarbara T. Poletti and the estate of her late husband. She and her husband had filed a joint income tax return for 1983. At issue is whether distributions in the aggregate of $7,000 made by Ute Distribution Corp. (UDC) to Mrs. Poletti (petitioner) in 1983 were exempt from taxation by reason of 25 U.S.C. section 677p (1982). The facts were stipulated.

Petitioner resided "near" Pocatello, Idaho, at the time the petition herein was filed. She is the duly appointed and acting personal representative of her husband's estate, which is being administered in Idaho.

UDC was created pursuant to the Ute Partition Act of 1954 (also the Act or UPA),[1] now codified as amended in 25 U.S.C. secs. 677-677aa (1982).[2] The Act was one of a series of statutes enacted by Congress during the 1950s to reduce Federal involvement in Indian affairs.[3] The stated purposes of the Act were: (1) To provide for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof; (2) to terminate Federal supervision over the mixed-blood members' property; and (3) to assist the full-blood members to prepare for termination of Federal supervision of their property. Sec. 677.

One of the problems that the Act sought to address was the difference in attitudes of the full-blood and mixed-blood members, respectively, about their readiness for termination. "[T]he majority of the mixed-blood group [felt] that they [were] ready for a termination of Federal supervision over their property and the fullblood Indians [believed] that they [were] not ready for such action." H. Rept. 2493, 83d Cong., 2d. Sess. (1954); S. Rept. 1632, 83d Cong., 2d Sess. (1954).

---

[1] Ute Partition Act of 1954, ch. 1009, secs. 1-28, 68 Stat. 868.

[2] Except as otherwise indicated, section references herein are to the Ute Partition Act, as codified in 25 U.S.C.

[3] See Cohen, Handbook of Federal Indian Law 152-180 (1982 ed.).

The Act dealt with the situation by providing for the partition of tribal assets between the mixed-bloods and the full-bloods, followed by the distribution to the mixed-bloods of the assets allocable to them.

The partition was accomplished by first preparing rolls of the full-bloods and the mixed-bloods. Sec. 677g. The assets that were readily susceptible of division were then divided between the respective groups of full-bloods and mixed-bloods based upon the relative number of persons in the membership roll of each group. Sec. 677i. Provision was then made for the distribution to the individual members of the mixed-blood group of the divisible assets allocated to that group. Secs. 677l and 677m. Federal supervision over the mixed-bloods with respect to those assets was ended. Sec. 677o.

Federal supervision over each mixed-blood member and his property was, however, not terminated "as to his remaining interest in [certain] tribal property" such as unadjudicated claims against the United States, oil and mineral rights, and "other tribal assets not susceptible to equitable and practicable distribution." Sec. 677o. The nondivisible assets, which in large part consisted of subsurface oil, gas, and other mineral rights, were to be managed jointly by the Tribal Business Committee (TBC) on behalf of the full-bloods and by the authorized representative of the mixed-blood group, and the proceeds therefrom were to be "divided between the full-blood and mixed-blood groups in direct proportion to the number of persons comprising the final membership roll of each group". Sec. 677i. Pursuant to section 677i, the mixed-bloods organized the Affiliated Ute Citizens (AUC) and empowered AUC's board of directors to act as their authorized representative. The mixed-bloods thereafter approved a plan for dividing the tribal assets that was adopted by the TBC and the AUC. Under the plan, the mixed-bloods' share of the divisible assets was directly transferred to the mixed-bloods. With respect to the nondivisible assets, however, the plan provided for the formation of a corporation (UDC) that was jointly to manage the assets with the Tribal Business Committee, receive the income therefrom that represented the share of the mixed-blood group, and distribute that income to its shareholders.[4]

---

[4] The purposes of UDC are set forth in Art. IV of its Articles of Incorporation, as follows:

Upon removal of Federal restrictions on the distributable property of each individual member of the mixed-bloods, section 677v required the Secretary of Interior to publish in the Federal Register a proclamation stating that the trust relationship of the United States to each such person was terminated.[5] That proclamation was published by the Secretary effective August 27, 1961. 26 Fed. Reg. 8042.

As part of the distribution plan, each mixed-blood was to receive 10 shares of UDC stock, which entitled the holder to vote for mixed-blood delegates and to share in the proceeds of the jointly managed assets. However, when a mixed-blood sold his or her shares, that person no longer would have a voice in management of the undivided assets or any rights therein.

Mrs. Poletti is a mixed-blood Ute Indian who received her shares in UDC as part of the original distribution of shares to mixed-blood Ute Indians.

UDC receives trust funds collected by the Bureau of Indian Affairs, Department of the Interior, on lease and royalty agreements with oil companies, which funds are periodically distributed to the UDC shareholders. During 1983, Mrs. Poletti received distributions from UDC aggregating $7,000 which consisted of her share of the revenues collected by UDC pursuant to the agreements just described, and which were paid to her by reason of her ownership of stock in UDC.

The Commissioner determined that the $7,000 distributions to petitioner represented "taxable income" that should have been reported in the 1983 joint return filed by petitioner and her husband. We sustain the Commissioner.

Preliminarily, we note first that in our income tax law Congress intended to exert "the full measure of its taxing

---

to manage jointly with the Tribal Business Committee * * * all unadjudicated or unliquidated claims against the United States, all income from oil gas and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members * * * may hereafter become entitled * * * and to receive the proceeds therefrom and to distribute the same to the stockholders of this corporation as herein provided.

[5] Sec. 677v provided:

Upon removal of Federal restrictions on the property of each individual mixed-blood member of the tribe, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to such individual is terminated. Thereafter, such individual shall not be entitled to any of the services performed for Indians because of his status as an Indian. All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction.

power." *HCSC-Laundry v. United States,* 450 U.S. 1, 5 (1981); *Helvering v. Clifford,* 309 U.S. 331, 334 (1940). Second, Indians are citizens and are liable for the payment of Federal income taxes, unless exempted by applicable treaties or remedial legislation. *Squire v. Capoeman,* 351 U.S. 1, 6 (1956); *Estate of Shelton v. Commissioner,* 68 T.C. 15, 21 (1977). However, as stated by the Court in *Estate of Shelton v. Commissioner, supra* at 21: "While the general rule requires tax exemptions to be clearly expressed, statutes affecting Indians are liberally construed, with all doubtful expressions resolved in their favor." Nevertheless, as explained hereinafter, we conclude that the statute leaves no room for doubt that the distributions received by petitioner from UDC are taxable.

The taxability of distributions of Ute tribal assets and related income among the tribe members is not mentioned anywhere in the Internal Revenue Code. It is, however, dealt with in the Ute Partition Act of 1954, which, as noted above, is now codified as amended in 25 U.S.C. secs. 677-677aa (1982). At issue here is the effect of section 677p, pertinent parts of which are as follows:

Sec. 677p. Tax exemption; exceptions and time limits; valuation for income tax on gains or losses

No distribution of the assets made under the provisions of this subchapter shall be subject to any Federal or State income tax * * * Property distributed to the mixed-blood group pursuant to the terms of this subchapter shall be exempt from property taxes for a period of seven years from August 27, 1954, unless the original distributee parts with title thereto, * * * . *After seven years from August 27, 1954, all property distributed to the mixed-blood members of the tribe under the provisions of this subchapter, and all income derived therefrom by the individual, corporation, or other legal entity, shall be subject to the same taxes, State and Federal, as in the case of non-Indians;* except that any corporation organized by the mixed-blood members for the purpose of aiding in the joint management with the tribe and in the distribution of unadjudicated or unliquidated claims against United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution shall not be subject to corporate income taxes. * * * [Emphasis supplied.]

It is quite true that the first sentence of section 677p does provide for tax exemption. But subsequent qualifying language unambiguously states that after 7 years from August 27, 1954, "all property distributed to the mixed-blood[s]

\* \* \* and all income derived therefrom \* \* \*, shall be subject to the same taxes, State and Federal, as in the case of non-Indians". This language explicitly covers the 1983 distributions to petitioner with respect to her shares of stock in UDC. We reject petitioners' strained and unnatural interpretation of the statute—an interpretation that would authorize taxation after August 27, 1961, only of "property which has in fact been distributed to mixed-blood members and the income derived therefrom," petitioners' opening brief, at 10, and that "no tax was intended by Congress on distributions." Petitioners' reply brief at 9. This unnatural interpretation of the statutory language is particularly unpersuasive here, since the UDC shares had already been distributed to the mixed-bloods, and what is involved in this case is the income derived from those shares which is reflected in the distributions made with respect to such shares.

In sharp contrast to the provision authorizing taxation after 7 years from August 27, 1954, is the exception thereto, immediately following in the same sentence. That exception explicitly exempts from income tax any corporation organized by the mixed-bloods to aid "in the joint management with the tribe [i.e., the full-bloods as a group] and in the distribution of \* \* \* all gas, oil, \* \* \* and all other assets not susceptible to equitable and practicable distribution". Sec. 677p. Such exemption was obviously appropriate in view of the fact that the full-bloods, who were still wards of the United States, had a stake in the management of the assets jointly owned with the emancipated mixed-bloods. But the status of the mixed-bloods as individuals was an entirely different matter. And the status of the property of the mixed-bloods, as well as the nature of UDC stock itself, was described by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 149-150 (1972), as follows:

The proclamation of August 26, 1961, was contemplated by sec. 23 of the Act, 25 U.S.C. sec. 677v. To the extent the nature of the property so permitted, this marked the fulfillment of the purpose set forth in sec. 1 of the Act, 25 U.S.C. sec. 677, namely, the termination of federal supervision over the trust and restricted property of the mixed-bloods. It stated specifically that the mixed-blood thereupon "shall not be entitled to any of the services performed for Indians because of his status as an Indian." This broad reference obviously included the shares of UDC although the undivided

interests in turn held by UDC and shared with the full-bloods remained subject to restrictions after the proclamation. Sec. 16(a), 25 U.S.C. sec. 677o(a). *The UDC stock itself, however, was free of restriction; as to it, federal termination was complete. Each mixed-blood could sell his shares as he wished and to whom he pleased, subject thereafter only to the restrictions imposed by UDC's own articles.* * * * [Emphasis supplied.]

Surely, Congress could hardly have intended distributions to the non-Indian purchaser of UDC shares of stock to be subject to tax while at the same time exempting from tax the distributions to a mixed-blood in respect of his retained shares. Both the non-Indian owner and the mixed-blood owner of shares of stock stand on the same footing with respect to their relationship to UDC. To differentiate between them in these circumstances would indeed be inappropriate in view of the general objective of the statutes enacted during the 1950s looking towards the integration of the Indians in our society.

The result that we reach here is in accord with *Ute Distribution Corp. v. United States,* 721 F. Supp. 1202 (D. Utah 1989), affd. on this issue 938 F.2d 1157 (10th Cir. 1991), where the precise question was considered in exhaustive opinions by both the District Court and the Court of Appeals. Among the parties in that case were four stockholders seeking refunds of taxes paid with respect to distributions by UDC. Two of them were original mixed-blood stockholders, another was a full-blood who elected to be terminated pursuant to the Act and had acquired additional shares by inheritance, and the fourth was a non-Indian who had purchased his shares. It was held in that case that the distributions to all of these stockholders were taxable in accord with section 677p. Petitioners do not argue that the case is not in point, but they urge us to reach the opposite result. We decline to do so. Here, as in that case, petitioner received her distributions not because of her status as a mixed-blood Ute Indian but because of her shareholdings in UDC. It should be remembered that, like other Indian termination statutes, the Ute Partition Act reflects a broader congressional policy of making Indians "as rapidly as possible * * * subject to the same laws and entitled to the same privileges and responsibilities" as non-Indian citizens and thereby "end[ing] their status as

wards of the United States." H. Con. Res. 108, 83d Cong., 1st Sess. (1953); see also Cohen, Handbook of Federal Indian Law 171-175 (1982 ed.).

———

Although the District Court in the *Ute Distribution Corp.* case held that the distributions were taxable to the stockholders, it held further that it would apply its decision prospectively only; i.e., to distributions "[commencing] with the tax year 1989." 721 F. Supp. at 1208. The Court of Appeals reversed as to this aspect of the District Court's opinion. The parties herein do not seem to address this point. We decline to limit our holding to make it prospective only. The Supreme Court in *United States v. Estate of Donnelly,* 397 U.S. 286, 294-295 (1970), stated:

Acts of Congress are generally to be applied * * * from the date of their effectiveness onward. Generally, the United States, like other parties, is entitled to adhere to what it believes to be the correct interpretation of a statute, and to reap the benefits of that adherence if it proves to be correct, * * *. In *rare* cases, decisions construing federal statutes might be denied full retroactive effect, as for instance where this Court overrules its own construction of a statute * * *. [Emphasis supplied.]

See also *Benedict Oil Co. v. United States,* 582 F.2d 544, 549 (10th Cir. 1978); *C. Blake McDowell, Inc. v. Commissioner,* 71 T.C. 71, 73-74 (1978), affd. 652 F.2d 606 (6th Cir. 1980).

*Decision will be entered for respondent.*