**ESTATE OF Robert POLETTI, Deceased; LaBarbara T. Poletti, Personal Representative; LaBarbara T. Poletti, Petitioners–Appellants,**

v.

**COMMISSIONER, INTERNAL REVENUE SERVICE, Respondent–Appellee.**

No. 93–70270.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1994.

Decided Aug. 10, 1994.

Kent A. Higgins, Idaho Falls, ID, for petitioners-appellants.

Gary R. Allen, Richard Farber and Robert W. Metzler, Asst. U.S. Attys., Washington, DC, for respondent-appellee.

Before: POOLE, BRUNETTI, and KLEINFELD, Circuit Judges.

BRUNETTI, Circuit Judge:

LaBarbara Poletti ("Petitioner") is a mixed-blood Ute Indian who in 1983 received from the Ute Distribution Corporation ("UDC") distributions of monies generated by oil, mineral, and gas production on the Ute Indian Reservation. Representing herself and the estate of her late husband, Robert Poletti, Petitioner appeals the decision of the tax court which found that the distributions received by Petitioner were taxable and upheld the deficiency in income tax due determined by the Commissioner of Internal Revenue. Because we find that the tax court correctly found the distributions taxable, we affirm.

### I. FACTS

The Ute Partition Act of 1954 ("UPA")[1] was one of a series of statutes enacted during the 1950s to reduce federal involvement in

**1.** Except as otherwise indicated, all section references herein are to the UPA, now codified as amended in 25 U.S.C. §§ 677–677aa.

Indian affairs. Enacted in response to proposals initiated by the Ute Tribe of Indians in Utah, UPA's purposes were: (1) "to provide for the partition of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members[2] thereof"; (2) "for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe"; and (3) "for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property." § 677.

These purposes reflected the different attitudes of the full-blood and mixed-blood members about their readiness for termination. "According to testimony from members of the Ute Tribe, the majority of the mixed-blood group [felt] that they [were] ready for a termination of Federal supervision over their property and the fullblood Indians believe[d] that they [were] not ready for such action." H.R. No. 2493, 83d Cong., 2d Sess. (1954) *reprinted in* 1954 U.S.C.C.A.N. 3355, 3356 (1954).

The termination process first required a partition of tribal assets between the full-bloods and the mixed-bloods. The assets that were readily susceptible to equitable and practicable division were then divided between the full-bloods and mixed-bloods based on the relative numbers of persons on the membership roll of each group. § 677i. After the division, the individual mixed-blood members received a distribution of the divisible assets that had been allocated to their group. §§ 677*l*, 677m. When any mixed-blood received such distribution, federal supervision over that member and his or her property with respect to the divisible assets ended. § 677*o*.

Federal supervision of mixed-blood members and his or her property, however, was not terminated "as to his [or her] remaining interest in tribal property in the form of any unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other tribal assets not susceptible to equitable and practicable distribution." § 677*o*. These nondivisible assets were to be managed jointly by the Tribal Business Committee ("TBC") representing the full-bloods and by the authorized representatives of the mixed-blood group. The proceeds therefrom, after deducting the costs chargeable to management, were to be "divided between the full-blood and mixed-blood groups in direct proportion to the number of persons comprising the final membership roll of each group and without regard to the number of persons comprising each group at the time of the division of such proceeds." § 677i.

Pursuant to § 677i, the mixed-bloods organized the Affiliated Ute Citizens ("AUC"), empowered AUC's board of directors to act as their authorized representative, and approved a plan, adopted by the TBC and the AUC, for dividing the tribal assets. Under the plan, the mixed-bloods directly received their share of the divisible assets. "Upon removal of Federal restrictions on the property of each individual member of the tribe," § 677v required the Secretary to "publish a proclamation declaring that the Federal trust relationship to such individual is terminated."[3] § 677v. The Secretary published that proclamation effective August 27, 1961. 26 Fed.Reg. 8042.

---

2. UPA defines "full-blood" as "a member of the tribe who possesses one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half, excepting those who become mixed-bloods by choice under the provisions of section 677c of this title." § 677a(b). "Mixed-blood" is defined as "a member of the tribe who does not possess sufficient Indian or Ute Indian blood to fall within the full-blood class as herein defined, and those who become mixed-bloods by choice under the provisions of section 677c of this title." § 677a(c). A full-blood member could have applied to become identified with and a part of the mixed-blood group within 30 days after publication of the proposed roll of full-blood members. § 677c.

3. Once the Secretary issued this proclamation, such individual was no longer "entitled to any of the services performed for Indians because of his [or her] status as an Indian." § 677v. In addition, "[a]ll statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction." § 677v.

The proclamation, however, did not terminate the federal trust relationship with respect to the nondivisible assets. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 139, 92 S.Ct. 1456, 1465, 31 L.Ed.2d 741 (1972). The plan provided for the formation of a corporation [4] ("UDC") to jointly manage those assets with the TBC, to receive the mixed-bloods' share of the income therefrom, and to distribute that income to its shareholders.[5] Each mixed-blood was to receive 10 shares of UDC stock which entitled the holder to vote for mixed-blood delegates and to share in the proceeds of the jointly managed assets. However, when a mixed-blood sold his or her shares, that person lost his or her voice in management of the undivided assets and any rights therein. Pursuant to UDC's articles, for the first 10 years from UPA's date, any mixed-blood shareholder who wished to sell or dispose of his or her UDC stock was to offer it first to members of the tribe, both mixed-bloods and full-bloods.[6] *See id.* at 137. UDC receives trust funds collected by the Bureau of Indian Affairs, Department of the Interior, on lease and royalty agreements with oil companies and periodically distributes those funds to the UDC shareholders. *See* Stipulation of Facts at 5.

Petitioner, residing near Pocatello, Idaho when she filed the petition in this case, is a mixed-blood Ute Indian who received her shares in UDC as part of the original distribution of shares to mixed-blood Ute Indians. Unlike many of the mixed-bloods, petitioner retained her ownership in the stock and continued to receive distributions from UDC. *See generally Affiliated Ute Citizens,* 406 U.S. 128, 92 S.Ct. 1456 (many mixed-bloods had sold their shares to non-Indians, and a group of mixed-bloods brought suit alleging securities violations and breach of trust). During 1983, Petitioner received distributions from UDC aggregating $7000. The Commissioner determined that the $7000 in distributions to Petitioner represented "taxable income" that should have been reported in the 1983 joint return filed by Petitioner and her husband.[7] After allowing for a dividend exclusion of $200 and making an adjustment for itemized expenses, the Commissioner assessed a deficiency in income tax in the amount of $1538 for the taxable year 1983.

The tax court, relying on the Tenth Circuit's decision in *Ute Distrib. Corp. v. United States,* 938 F.2d 1157 (10th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992), upheld the Commissioner and found the distributions taxable. In *Ute*

---

**4.** The United States requested the formation of this corporation "[s]ince liquidation and division of these assets may extend for many years ... [and] [i]n the future years the corporation would avoid the expenditure by the United States of substantial sums in administrative costs." H.R. No. 2744, 84th Cong., 2d Sess. 2 (1956). In 1956, the UPA was amended to specifically provide for the formation of this corporation. Petitioner uses the facts that the government benefited from the formation of the corporation and that the UPA in its original form did not specifically contemplate a corporation to support her argument that the distributions from the corporation are not taxable. As we conclude, these facts do not affect the taxability of the distributions.

**5.** Art. IV of UDC's Articles of Incorporation states that UDC's purposes are "to manage jointly with the Tribal Business Committee ... all unadjudicated or unliquidated claims against the United States, all income from oil gas and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members ... may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to

the stockholders of this corporation as herein provided." *See Affiliated Ute Citizens,* 406 U.S. at 136, 92 S.Ct. at 1463.

**6.** The UPA included an equivalent right of first refusal for a mixed-blood's disposal of real property. § 677n.

**7.** It appears that the Internal Revenue Service ("IRS") considered UDC distributions tax-exempt for many years. However, "[i]n 1982, an IRS field agent asserted the probable tax status of the distributions based on section 677p of the UPA. This position was formalized in a letter by an IRS attorney who stated:

'[There] is no basis for distinguishing distributable and nondistributable assets or property for the purposes of this exemption and that it was the intent of Congress in terminating federal supervision over mixed-blood trust assets to treat the mixed-bloods as non-Indians. Therefore, we believe that any distribution made to a mixed-blood after August 27, 1961 was and is subject to income tax.'"
*Ute Distrib. Corp. v. United States,* 938 F.2d 1157, 1160 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992).

*Distrib.*, the Tenth Circuit addressed the same issue that is presented in this case and held that the plain language of the UPA in § 677p rendered taxable the distributions made by UPC to mixed-blood members after August 27, 1961. *Id.* at 1162–63. Petitioner now appeals from the tax court's decision, 99 T.C. No. 29, 1992 WL 321330 (1992), which found her liable for the $1538 deficiency.

## II. DISCUSSION

■ We review de novo questions of statutory construction. *Williamson v. C.I.R.*, 974 F.2d 1525, 1529 (9th Cir.1992).

> Statutory construction always starts with the language of the statute itself. This starting part is the ending point when the statute clearly and unambiguously expresses Congress' intent. Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme. A court looks to the legislative history if the statute is unclear.

*United States v. Derr*, 968 F.2d 943, 945 (9th Cir.1992) (citations omitted).

This case involves the construction of § 677p with respect to the distributions Petitioner received from the UDC. Section 677p, which defines tax exemption, exceptions and time limits, and valuation for income tax on gains or losses in the UPA, provides that:

> No distribution of the assets made under the provisions of this subchapter shall be subject to any Federal or State income tax: *Provided*, That so much of any cash distribution made under this subchapter as consists of a share of any interest earned on funds deposited in the Treasury of the United States shall not by virtue of this subchapter be exempt from individual income tax in the hands of the recipients for the year in which paid. Property distributed to the mixed-blood groups pursuant to the terms of this subchapter shall be

> exempt from property taxes for a period of seven years from August 27, 1954, unless the original distributee parts with title thereto, either by deed, descent, succession, foreclosure of mortgage, sheriff's sale or other conveyance; ... *After seven years from August 27, 1954, all property distributed to the mixed-blood members of the tribe under the provisions of this subchapter, and all income derived therefrom by the individual, corporation, or other legal entity, shall be subject to the same taxes, State and Federal, as in the case of non-Indians;* except that any corporation organized by the mixed-blood members for the purpose of aiding in the joint management with the tribe and in the distribution of unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution shall not be subject to corporate income taxes. Any valuation for purposes of Federal income tax on gains or losses shall take as the basis of the particular taxpayer the value of the property on the date title is transferred by the United States pursuant to this subchapter.

§ 677p (first emphasis in original and second emphasis added).

■ Petitioner urges the panel to conclude differently from the Tenth Circuit and the tax court. Her main argument is that the UDC distributions do not constitute "property distributed" within the contemplation of § 677p, since "property distributed" refers only to the distributable assets; therefore, because she is still a member of the tribe with respect to the undivided assets, and received the distributions because of her status as a mixed-blood, the distributions are not subject to taxation pursuant to § 677p's first sentence.[8] This argument, however,

---

**8.** Petitioner contends that *United States v. Felter*, 752 F.2d 1505 (10th Cir.1985), supports her position. In *Felter*, the Tenth Circuit held that hunting and fishing rights were included within the nondivisible assets, and thus, a mixed-blood was not criminally liable for hunting and fishing within the reservation held in trust for the Ute Indian Tribe. Because the UPA does not contain specific provisions on the right to hunt and fish,

the court "refuse[d] to impute to Congress an intent to abrogate the right of the mixed-blood Ute Indians to hunt and fish on reservation land and instead h[e]ld that the right to hunt and fish on the reservation is an 'asset[] not susceptible to equitable and practicable distribution' under § 677i." *Id.* at 1509, 1512.

Petitioner believes that because she was not terminated as to hunting and fishing rights, she

contradicts the plain language of the statute, which states that "all property distributed" to mixed-bloods, and all income derived therefrom, shall be subject to taxation seven years after August 27, 1954.

The Tenth Circuit rejected this same argument in *Ute Distrib. Corp. v. United States*, 938 F.2d 1157 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992). In that case, representative stockholders of UDC, two original mixed-blood shareholders, a full-blood who elected to be terminated from the tribe pursuant to the UPA, and a non-Indian, sued for a refund of federal income taxes on distributions from UDC. Relying on the plain language of § 677p, the Tenth Circuit held that "UDC shareholders must pay federal income tax on all distributions received after August 27, 1961." *Id.* at 1162. The court rejected the shareholders' argument that the "UDC distributions are exempt from federal income tax because the general income tax exemption found in the first sentence [of § 677p] is not modified as it relates to income distributions derived from indivisible assets" since "the phrase 'property distributed' only refers to property that previously had been distributed tax-free." *Id.* at 1163. The court found this a "tortured construction of § 677p[,]" since "[s]ection 677p's exemption expires on August 27, 1961 with respect to "all property distributed"; the provision does not state the exemption expires on that date only as to property previously distributed tax free." *Id.*

We agree with the Tenth Circuit in holding that the plain language of the statute determines the outcome of this case. Section 677p explicitly states that "all property distributed to the mixed-blood members" and "all income derived therefrom … will be subject to the same taxes, State and Federal, as in the case of non-Indians" after seven years from August 27, 1954. § 677p. No qualifying language or exception exists to indicate that nondistributable assets are not included. Thus, after August 27, 1961, the distributions, and any other property received by mixed-bloods, were taxable.[9]

The plain language of § 677p defeats Petitioner's claim, even if, as she argues, she received her distributions because of her mixed-blood status, rather than because she is a UDC shareholder. UPA defines "asset" as "[a]ny property of the tribe, real, personal or mixed, whether held by the tribe or by the United States in trust for the tribe, or subject to a restriction against alienation imposed by the United States." § 677a(f). Since UPA specifically defines "asset" as "any property," including that held in trust for the tribe, the UDC distributions are "assets" of the tribe and "property distributed" to the tribe. Regardless of whether UDC stock is an "asset" or "property," the UDC distributions from the property held in trust are "property distributed" and therefore became subject to tax on August 27, 1961. This is true even though the mixed-bloods still may be members of the tribe with respect to the nondivisible assets. The fact that the Ute Indian Tribe is not taxed on distributions that it receives by virtue of its holdings of UDC stock is inapposite, since

---

was not terminated as to oil, gas, and mineral rights and thus cannot be taxed on the distributions. This argument, however, does not overcome the plain language of § 677p. The fact that Petitioner may have hunting and fishing rights merely suggests that there are other nondivisible assets. Furthermore, the Tenth Circuit in *Ute Distrib.* did not find that *Felter* required that it hold the distributions not subject to income tax.

9. The tax court also found the distributions taxable on the basis of § 677p's unambiguous language. The court noted the tax exemption in the first sentence of § 677p. However, it found that subsequent qualifying language unambiguously states that after seven years from August 27, 1954, " 'all property distributed to the mixed-blood[s] … and all income derived therefrom …, shall be subject to the same taxes, State and Federal, as in the case of non-Indians.' " This language explicitly covers the 1983 distributions to petitioner with respect to her shares of stock in UDC. [Tax Court Opinion at 8] The court rejected Petitioner's argument that "all property distributed" does not include any distributions from the nondivisible assets and found "[t]his unnatural interpretation of the statutory language [ ] particularly unpersuasive here, since the UDC shares had already been distributed to the mixed-bloods, and what is involved in this case is the income derived from those shares which is reflected in the distributions made with respect to such shares." [Tax Court Opinion at 8–9]

the Tribe enjoys immunity from taxation; in contrast, the UPA provided immunity from taxation for the mixed-bloods for only seven years after the adoption of the UPA in 1954.[10]

We also find, as did the Tenth Circuit, that even if we look at the legislative history, nothing contradicts the unambiguous nature of § 677p. Subjecting property distributed to the mixed-bloods to taxation after seven years from August 27, 1954 reflects Congressional policy to enable terminated Indians to acquire the same rights and responsibilities of United States Citizens. *See Ute Distrib. Corp.*, 938 F.2d at 1162–63 ("section 677p reflects the general policy of enabling Indians to participate fully in the rights and responsibilities of United States citizens. For the mixed-bloods, the application of this policy in section 677p would require them to assume the responsibility of paying taxes on all income received after their membership in a distinct Indian tribe was terminated.") Furthermore, although certain other termination acts from the 1950s "revealed an intention that distributions to Indians remain tax-free in perpetuity[,]" termination of the Ute Indians was unique because of the necessity to divide distributable and nondistributable assets between full-bloods and mixed-bloods. *Id.* at 1163. Thus, we agree with the Tenth Circuit that § 677p "with its limited exception [for distributions made to the mixed-bloods prior to their termination] represents Congress' resolution of the taxation issues involved in the distribution of indivisible tribal assets." *Id.*

The Supreme Court's decision in *Affiliated Ute Citizens*, 406 U.S. 128, 149–50, 92 S.Ct. 1456, 1470, 31 L.Ed.2d 741 (1972), also supports our analysis. Deciding that the United States could not be liable for failure to restrain a sale of UDC stock, the Supreme Court found that "there was no remaining governmental authority over those shares." *Id.* at 150, 92 S.Ct. at 1470. The Court decided that the Secretary's proclamation that the mixed-bloods

"shall not be entitled to any of the services performed for Indians because of his [or her] status as an Indian" ... obviously included the shares of UDC although the undivided interests in turn held by UDC and shared with the full-bloods remained subject to restrictions after this proclamation. The UDC stock itself, however, was free of restriction; as to it, federal termination was complete. Each mixed-blood could sell his shares as he [or she] wished and to whom he [or she] pleased, subject only to the restrictions imposed by UDC's own articles.

*Id.*

Distinguishing between the undivided interests held by UDC and the UDC stock itself, as the Supreme Court did, supports the tax court's finding that the separation of UDC stock from the property held in trust by the UDC showed that "[b]oth the non-Indian owner and the mixed-blood owner of shares of stock stand on the same footing with respect to their relationship to UDC." [Tax Court Opinion at 10] As the tax court reasoned, Congress "could hardly have intended distributions to the non-Indian purchaser of UDC shares of stock to be subject to tax while at the same time exempting from tax the distributions to a mixed-blood in respect of his [or her] retained shares[,]" since to do so would contradict the Congressional policy, reflected in the UPA, of "making Indians 'as rapidly as possible ... subject to the same laws and entitled to the same privileges and responsibilities' and non-Indian citizens and thereby 'end[ing] their status as wards of the United States.'" [Tax Court Opinion

---

**10.** Petitioner also argues that the fact that UDC, as the corporation to aid in the joint management with the tribe in the distribution of nondivisible assets, is not subject to corporate income tax indicates that she should not have to pay income tax on the distributions received from UDC. This argument is not persuasive. Not taxing the UDC simply prevents double taxation and recognizes the fact that § 677p does not apply to the full-bloods, who also have an interest in the nondivisible assets. The exception in § 677p explicitly exempts from income tax "any corporation organized by the mixed-blood members for the purpose of aiding in the joint management with the tribe [the TBC representing the full-bloods] and in the distribution of ... all gas, oil, and mineral rights ... and all other assets not susceptible to equitable and practicable distribution." § 677p. As the tax court correctly found, this exemption is "obviously appropriate in view of the fact that the full-bloods, who were still wards of the United States, had a stake in the management of the assets jointly owned with the emancipated mixed-bloods. But, the status of the mixed-bloods as individuals was an entirely different matter." [Tax Court Opinion at 9]

at 10, 11] Thus, taxing the UDC distributions is consistent with the Supreme Court's decision in *Affiliated Ute Citizens* and mandated by the plain language of § 677p.[11]

### III. CONCLUSION

The tax court correctly upheld the Commissioner's determination of income tax deficiency and found the UDC distributions taxable.

AFFIRMED.

**11.** Petitioner's additional arguments relate to the constitutionality of Congress' termination of the mixed-blood Ute Indians. These arguments are similar to those made in a suit filed by Petitioner's attorney for declaratory and injunctive relief and monetary damages based on the claim that "Congress, in enacting the Termination Act, violated [plaintiffs'] rights under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution." *Tabbee v. United States*, 30 Fed. Cl. 1, 2–3 (1993). The claims court dismissed plaintiffs' claims on statute of limitations grounds.

Because the Supreme Court has found the UPA and the formation of UDC constitutional, *see Affiliated Ute Citizens*, 406 U.S. 128, 92 S.Ct. 1456, Petitioner's additional arguments are unpersuasive and do not relate to the taxable nature of the UDC distributions. The Supreme Court has held that "(a) UDC was lawfully created, (b) UDC is the authorized representative of the mixed-bloods under the Partition Act and (c) the termination proclamation ended all federal supervision and trust relationships with respect to the UDC shares." *Id.* at 136–37, 143–44, 149–50, 92 S.Ct. at 1463–64, 1467, 1470. In addition, Petitioner fails to support her claim that by taxing the distributions, the Commissioner is taking a "vested property right" without compensation and subjecting the government to liability. Nor does Petitioner point to anything in the UPA or offer any support for her assertion that the mixed-bloods' right to tax immunity is a "vested property right." Petitioner's additional constitutional claims do not contradict or undermine the plain language of § 677p, and while we recognize that Congress has reversed or abandoned its termination policies for some tribes, it has not done so with respect to the mixed-blood Ute Indians.